Isabella Eldridge (Utah Bar No. 19517)
BLUERIBBON COALITION, INC
800 W Main Street, Suite 1460
Boise, ID 83702
Telephone: (405) 464-9060
Email: bella.eldridge@blueribboncoalition.org

*Attorney for BlueRibbon Coalition, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| BLUERIBBON COALITION, INC.<br><br>     Plaintiffs,<br><br>vs.<br><br>BUREAU OF LAND MANAGEMENT, U.S. DEPARTMENT OF THE INTERIOR<br><br>     Defendants. | **COMPLAINT**<br><br>Case No. _____<br><br>Judge _____ |

Plaintiff BlueRibbon Coalition, Inc. seeks relief from this Court against Defendants Bureau of Land Management and the United States Department of the Interior and would show the Court as follows:

**INTRODUCTION**

1. This lawsuit challenges the route closures established by Defendants' approval of the Henry Mountains and Fremont Gorge Travel Management Plan/Final Environmental Assessment, and the associated Decision Record (DOI-BLM-UT-C020-2018-0006-EA).[1] The final decision

---

[1] *See* Bureau of Land Management, *Henry Mountains and Fremont Gorge Travel Management Plan Environmental Assessment*, DOI-BLM-UT-C020-2018-0006-EA (Jan. 2025); Bureau of Land Management, *Finding of No Significant Impact*, DOI-BLM-UT-C020-2018-0006-EA (Jan. 2025); Bureau of Land Management, *Henry Mountains and Fremont Gorge Travel Management*

1

selected an alternative that contradicts public input, does not fit into any of BLM's proposed alternatives, and further restricts access in an area already surrounded by restricted lands, diminishing one of the few remaining opportunities for motorized recreation.

2. These route closures result in three problems. The closures constitute a violation of the Expanding Public Lands Outdoor Recreation Experiences Act[2] ("Explore Act" or "Act"), are largely based on arbitrary and capricious reasoning resulting in a violation of the Administrative Procedures Act ("APA"), and are a violation of the National Environmental Policy Act ("NEPA").

3. The Henry Mountains and Fremont Gorge Travel Management Area ("TMA") is well-known for its spectacular overlooks and ruggedness. The TMA is "sought after [for] recreational OHV riding opportunities", as well as for hunting big game. Decision Record ("DR") at DR-7. As such, the beauty and recreational value of the area has led to the TMA becoming a cherished spot for locals and tourists alike.

4. Plaintiffs allege that Defendants' motorized restrictions and route closures in the TMA are *ultra vires*, arbitrary and capricious, and a violation of federal law.

5. Plaintiffs ask this Court to find Defendants' actions unlawful; and to set aside the TMP.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. §§ 2201-02 (declaratory judgment); and the Administrative Procedure Act ("APA") 5 U.S.C. §§ 701-06. These claims arise under the Explore Act, EXPLORE Act, Pub. L. No. 118-234, H.R. 6492, 118th Cong. (2025); the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(2)(C); and the APA, 5 U.S.C. § 706.

---

*Plan Decision Record*, DOI-BLM-UT-C020-2018-0006-EA (Jan. 2025). These documents are available on BLM's website: https://eplanning.blm.gov/eplanning-ui/project/94098/570
[2] *See* EXPLORE Act, Pub. L. No. 118-234, H.R. 6492, 118th Cong. (2025).

8. The Administrative Procedure Act ("APA") also authorizes judicial review of Defendant's actions because Defendants have acted contrary to law and without lawful authority, 5 U.S.C. § 706(2)(c), arbitrarily, capriciously, and not in accordance with law. 5 U.S.C. § 706(2)(A).

9. Venue is proper under 28 U.S.C. § 1391(e)(1) because the lands that are subject to this case are located in Utah.

## PARTIES

10. Plaintiff BlueRibbon Coalition, Inc. ("BlueRibbon") is a non-profit organization with a mission to improve access to public lands by securing, protecting, and expanding shared outdoor recreation access and use. BlueRibbon is headquartered in Idaho and has members in all 50 states. Its members use and enjoy public lands in the TMA and often traveled the routes now closed by the TMP. They participate in many recreational activities on our public lands – such as dirt biking, mountain biking, e-biking, backcountry aviation, base jumping, hiking, wildlife viewing, photography, scenic driving, dispersed camping, water sports, hunting, and rock climbing – but are especially involved in exploring the area with their off-highway vehicles ("OHVs"). These activities include organized rides, informal get-togethers, family vacations, and solo recreation rides. BlueRibbon themselves regularly submitted public comments on the plan and was an intervenor in the previous litigation that led to BLM agreeing to reconsider the previous travel plan.

11. Defendant Bureau of Land Management is the agency within the United States Department of the Interior that is responsible for the management of approximately 23 million acres of federal public land in Utah, including the public lands in the TMA at issue in this litigation. BLM is directly responsible for carrying out the Department of the Interior's obligations under

statutes and regulations governing land use management and for complying with NEPA, which requires the agency to carefully consider the environmental impacts of its actions.

16. Defendant United States Department of the Interior is responsible for overseeing the management of approximately five hundred million acres of federal public land across the United States.

**STATEMENT OF FACTS**

12. The TMA consists of 1,659,932 acres of land across portions of Garfield and Wayne counties in Utah, with 1,451,385 or 87%, of those acres being managed by BLM's Richfield Field Office. Environmental Assessment ("EA") at 3. Both areas are surrounded by National Parks, Wilderness Study Areas ("WSAs"), and Special Recreation Management Areas ("SRMAs"). *Id*.

13. In 2008, BLM's Richfield Field Office released a Record of Decision and Approved Resource Management Plan ("RMP") that designated routes for use by OHVs. EA at 1.

14. In 2015, the United States District Court for the District of Utah Central Division issued a Decision and Order remanding deficiencies found in the 2008 RMP/TMP to the BLM. *Id*.

15. In a 2017 Settlement Agreement[3] that aimed to resolve legal challenges to the 2008 RMP, BLM agreed to issue a new TMP for the Henry Mountains and Fremont Gorge. *Id*.

16. The BLM released the preliminary alternatives and preliminary route reports to the public on May 10, 2024. EA at 116. BLM initially received 530 comments, where only 25 members of the public attended the associated public meeting on May 28, 2024. *Id*.

---

[3] The Settlement Agreement was a result of Southern Utah Wilderness Alliance, et al. v. U.S. Department of the Interior, et al., U.S. District Court (D. Utah), Consolidated Case No. 2:12-cv-257. The 2017 Settlement Agreement can be accessed online at: https://eplanning.blm.gov/public_projects/nepa/93510/169299/205894/Final_Settlement_Agreement.pdf

17. BLM then held a public comment period on the Draft EA from September 25 through October 26, 2024. *Id*. BLM received 3,750 comments, where only 1,300 were considered substantive and led to changes to the EA. *Id*. Of the 1,300, 950 of them, or 73%, were route-specific comments on 560 of the routes where the public "expressed interest in maintaining OHV access to popular recreation destinations." *Id*. This shows the importance of motorized recreation in the TMA.

17. The draft EA proposed four alternative travel plans. Alternative A ("No Action") left the routes as they were. EA at 21. Alternative B prioritized protection of natural resources and would have closed 955 miles. *Id*. Alternative C was made to balance natural resource protection and motorized access and would have closed 519 miles. *Id.* Alternative D allowed for greater motorized access while also minimizing impacts to cultural resources and closed 373 miles. EA at 22.

18. BlueRibbon submitted comments for the TMP. Plaintiff raised concerns regarding the impacts to dispersed camping, alienation of the disabled community, inconsistent reasoning for certain closures, and a negative impact on local economies. Ex. A ("BRC TMP Comment").

19. The Final Decision Record was signed on January 17, 2025. A copy of this 2024 DR is attached hereto as Ex. D ("Decision Record").

20. The final DR chose none of the alternatives originally presented. It created a hybrid alternative that "respond[ed] to public comments while also prioritizing protection of resources, such as BLM Natural Areas, Lands with Wilderness Characteristics ("LWCs"), Wilderness Study Areas ("WSAs"), threatened and endangered species habitats, sensitive cultural resources, and riparian areas." DR at DR-5. It closed 93 more miles than Alternative C, and 239 more miles than Alternative D. This is despite the EA recognizing that all four alternatives are "in conformance"

with BLM's management directives in the 2008 RMP. EA at 4.

21. The selected alternative closes 612 miles, limits 28, and leaves 1,642 miles open to OHVs. DR at DR-2. The closures constitute 27% of the overall route mileage. *Id.*

22. On March 26, 2025, a bill was introduced by Utah Representative, Celeste Maloy, titled "To Nullify the Henry Mountains and Fremont Gorge Travel Management Plan".[4] This indicates strong public support for the nullification of this TMP.

23. Finally, the EA explains in detail BLM's intentions for the closed routes. In a section titled "Route Reclamation," BLM outlines how reclamation efforts will be prioritized for routes "leading into a designated Wilderness Study Area or BLM Natural Area" and "routes causing resource damage, or routes with a high risk for potential impacts to resources" EA at 173-74. Reclamation efforts include "obliterate[ing] tracks" and "disguising routes with natural materials, i.e. "vertical mulching", where rocks, dead wood, and plants are added to a route to make it blend in with the surrounding areas. *Id*. BLM will also "mechanically break up routes" which uses "heavy equipment (e.g., excavators, bulldozers, or harrow or seed drills)" which is referred to as "ripping and reseeding." *Id*. BLM may also install barriers, signs, and fences to foreclose travel on all closed routes. *Id*.

## COUNT I
*(Defendant's OHV restrictions and road closures violate the EXPLORE Act)*

24. Plaintiffs reallege and incorporate by reference the preceding paragraphs.

25. The defendants acted *ultra vires* and in violation of the law by restricting access to motorized recreation, thereby limiting access not only for the public but also for individuals with

---

[4] *See* Actions - H.R.2376 - 119th Congress (2025-2026): To nullify the Henry Mountains and Fremont Gorge Travel Management Plan, H.R.2376, 119th Cong. (2025), https://www.congress.gov/bill/119th-congress/house-bill/2376/all-actions

disabilities. This conduct directly contradicts the provisions of the Explore Act.

26. On January 4th, 2025, Congress passed the Explore Act which provides a framework for improving access to public lands, enhancing infrastructure, supporting and growing local economies, and ensuring that outdoor experiences are inclusive and sustainable for generations to come.

27. A key component of the Act is emphasis on expanding access to recreation on public lands, which includes motorized recreation. In fact, Sec. 127(d) of the Act outlines how the Secretaries "shall seek to create additional opportunities . . . for motorized [] access and opportunities on Federal recreational lands."

28. Despite this clear language, Defendants chose the second most restrictive alternative, Alternative E, that closes 612 miles of routes.

29. Alternative E prioritizes resource protection and limitations on OHV use, thereby reducing more motorized access compared to other alternatives. DR at DR-5. The decision record explicitly states that Alternative E closes more miles of routes than previous plans to protect certain land areas designated as WSAs and LWCs. DR at DR-6. This contradicts the Explore Act's plain directive to expand access rather than restrict it.

30. The Explore Act explains how the Secretary shall assess maintenance, expansion, and enhancement of recreation resources.[5] The decision to close routes under Alternative E fails to comply with this requirement, as it does not preserve, expand, or improve accessibility for motorized recreation. Notably, none of the alternatives proposed by the BLM meaningfully address this issue.

---

[5] *See* EXPLORE Act, Pub. L. No. 118-234, H.R. 6492, 118th Cong. (2025*)* at Sec. 112(a).

31. Further, Subtitle A, Sections 211-215 of the Act specifically require federal land management agencies to ensure accessible recreation opportunities for individuals with disabilities. This includes mandates for maintaining motorized access to trails, roads, and camping areas that allow individuals with mobility impairments to enjoy outdoor recreation.

32. Alternative E's significant reduction of motorized route access directly discriminates against individuals with disabilities who rely on OHVs, all-terrain wheelchairs, or other motorized means to access public lands. By closing routes that were previously open to motorized travel, BLM is effectively restricting access for individuals with mobility impairments, preventing them from reaching key recreation areas. This directly violates the plain language of the Explore Act.

33. Finally, Sec. 131, "Gateway Communities", directs land managers to ensure recreational access remains a priority for local economic and tourism benefits. Alternative E contradicts this by reducing key OHV access points that serve tourism and economic activity related to outdoor recreation in the region.

34. Specifically, Wayne and Garfield counties show the low-income rate being between 34%-36%. Ex. B at 5 ("BRC EA Comment"). Many vendors that provide tours and rentals rely on motorized recreation opportunities for income, so to close 612 miles under Alternative E is blatantly contradictory to Sec. 131 of the Act.

35. Plaintiffs respectfully request that this Court determine that Defendants acted unlawfully by restricting access to motorized recreation, thereby discriminating against individuals with disabilities and significantly harming local economic development.

## COUNT II
*(Defendant's actions are arbitrary and capricious)*

36. Plaintiffs reallege and incorporate by reference the preceding paragraphs.

37. Defendant's actions were arbitrary and capricious in many ways.

38. First, the agency "fail[ed] to consider an important aspect of a problem or offer[ed] an explanation for the decision that is contrary to the evidence . . ." *Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007) (cleaned up). And "the agency fail[ed] to 'articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made.'" *Friends of Wild Swan, Inc. v. U.S. Fish & Wildlife Serv.*, 12 F. Supp. 2d 1121, 1131 (D. Or. 1997) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983)). BLM

39. Second, the agency failed to respond to relevant' and significant public comments. *See N.M. Health Connections v. United States HHS,* 340 F. Supp. 1112, 1167 (D. N.M. Oct. 19, 2018) (quoting *Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1312 (D.C. Cir. 2014)). This demonstrates that the TMP was not based on consideration of the relevant factors.

40. For example, the BLM was "repeatedly asked" to acknowledge the existence of highly traveled routes that were inadequately documented in its inventory. Ex. C at ¶ 9 ("Griffin Declaration"). The BLM's response dismissed these concerns and suggested that the routes "must have been new," despite local witnesses stating that these trails have existed for generations. *Id*.

41. Specifically, routes WYHM0001b, WYHM0001d, WYNC0075, and WYNC0047c were closed despite being "actively used" by "local users". *Id.*

42. In their decision rationale for route WYNC0047c, The BLM asserts that this 4.2-mile route "has been closed since 2009,"[6] yet this claim is contradicted by on-the-ground evidence demonstrating that the route has long provided "unique recreational experiences" that are "deeply

---

[6] *See* Decision Record at DR-334.

valued" by many. *See* Griffin Declaration at ¶ 9. Also, this route is "primarily used by singletrack users". *See* BRC EA Comment at 12. However, the BLM's decision rationale and route report fail to recognize or address this form of usage.

43. Further, the decision rationales for closing routes WYPM0521, WYPM0495, and WYPM0486 present an apparent contradiction. On one hand, the closures are justified by the need to "enhance . . . opportunities for solitude,"[7] implying that reducing access will help preserve a more undisturbed and isolated experience for visitors. However, at the same time, the rationale acknowledges that "this designation may affect access to outstanding opportunities for primitive, unconfined recreation."[8] This admission suggests that restricting access may, in fact, limit the very experiences—such as remote, self-directed exploration—that define primitive recreation.

44. The EA's economic impact analysis also defies logic by claiming "visitation [and its economic contribution] would not change across the alternatives". EA at 141. But this cannot be, as the closure of 612 miles of previously well-known and frequently utilized routes will inevitably affect visitation.

45. The EA's economic analysis also explains how recreational hunting is an important "non-market value" to consider when deciding a TMP. *Id*. BLM also acknowledges that public commentary overwhelmingly emphasized the importance of maintaining OHV access for hunting and big game retrieval. DR at DR-7. Despite this, they *still* chose the second most restrictive alternative in complete contradiction to both public input,[9] and their own analysis.

46. The DR emphasizes the importance of balancing recreation with conservation, yet the chosen Alternative leans overwhelmingly toward restrictions, failing to consider balanced

---

[7] *See* DR at DR-384, 386, and 393.
[8] *Id*
[9] *See* EA at 116.

alternatives that allow for sustainable recreation.

47. BLM did not provide a satisfactory explanation as to why it had the Principal Deputy Assistant Secretary of Lands and Minerals Management, Steven Feldgus, approve the TMP. Historically, BLM has utilized the signature of the associated BLM District Manager or Field Manager to approve travel management plans. This provides aggrieved parties a 30-day period to appeal to the Interior Board of Land Appeals ("IBLA"), where the decision cannot take effect until this window expires. *See* 43 C.F.R. Part 4; § 4.21. Parties may also submit a petition to stay with the notice of appeal, delaying the implementation of the decision even further. *Id.* This is a well-known safeguard, and an IBLA decision is a final agency action for the purposes of judicial review. *See* 43 C.F.R. §§ 4.21(d), 4.403.

48. BLM instead relied on an exception that forfeits a party's ability to appeal to the IBLA. It explains if the Secretary signs a Decision, a party may not appeal to the IBLA and instead must bring an action in federal court. *See* § 4.410 (a)(3); DR at DR-11. Upon the Secretary's approval, the Decision is effective immediately.

49. This is not typical practice for BLM. For example, Plaintiffs are currently, and have previously been, parties in lawsuits concerning the BLM's decisions on the Labyrinth Rims/Gemini Bridges TMP and San Rafael Desert TMP, both of which provided Plaintiffs the opportunity to appeal to the IBLA. Ex. E ("IBLA Appeal Opportunities"). For an unknown reason, plaintiffs are no longer extended this courtesy. The inability to rely on the 30-day window as a temporary safeguard in plan implementation results in immediate harm and BLM provides no explanation for its decision, making it arbitrary and capricious.

50. The decision to have Steven Feldgus approve the TMP is not explained anywhere within the entire planning process, runs completely counter to BLM's *status quo* of allowing

appeals to the IBLA, and results in immediate harm to Plaintiffs.

51. Finally, the D.C. Circuit in *Marin Audubon Society v. FAA*, No. 23-1067 (D.C. Cir. 2024) ruled that federal agencies may not rely on regulations unless those regulations have a clear, statutory basis.

52. BLM relied on their "minimization criteria" found in 43 C.F.R. §8342.1 for the basis of route closures throughout the TMP. They justify their criteria by referencing the Federal Land Policy and Management Act ("FLPMA") and Executive Orders 11644 and 11989, with the minimization criteria being directly extracted from the executive orders. EA at 2. But the Court in *Marin* made clear: "An executive order is not law within the meaning of the Constitution", and as such, ". . . regulations cannot be justified solely as an exercise in a President's oversight of his administration." *Id*. Further, FLPMA only provides a broad mandate for multiple use and sustained yield, it does not provide a "clear, statutory basis" for these minimization standards. *Id.*

53. Accordingly, the use of these minimization criteria lacks the requisite statutory basis under *Marin*, resulting in arbitrary decision making.

54. Defendant's route closures and the approval of the TMP by the Principal Deputy Assistant Secretary of Lands and Minerals Management lack consistency in reasoning and fail to follow lawful procedures, making them arbitrary, capricious, and unlawful. Therefore, the Court should declare the DR invalid and set it aside.

## COUNT III
*(Defendant's actions violate NEPA)*

55. Plaintiffs reallege and incorporate by reference the preceding paragraphs.

56. NEPA was enacted in 1970 and requires federal agencies to consider the environmental impact of projects before approving or rejecting them. *See* 42 U.S.C. § 4321 et seq. Its "purpose

12

and function" is to show that "Federal agencies have considered relevant environmental information, and the public has been informed regarding the decision-making process." 40 C.F.R. § 1500.1.

57. NEPA requires agencies to take a "hard look" at how choices before them affect the environment. *Ctr for Biological Diversity v. United States*, 72 F.4th at 1178. This requires utilizing "public comment and the best available scientific information." *Id*. (quoting *Colo. Envtl. Coal v. Dombeck*, 185 F.3d 1162, 1171 (10 Cir. 1999)). And agencies must consider direct, indirect, and cumulative effects of the action. *Id*.

58. NEPA also requires agencies to conduct an Environmental Impact Statement ("EIS") for federal actions that significantly affect the quality of the human environment. See 42 U.S.C. § 4332(C). The "human environment means comprehensively the natural and physical environment and the relationship of present and future generations of Americans with that environment." 40 C.F.R. § 1508.1(m). In contemplating the human environment, agencies must consider the effects of their policies, whether beneficial or detrimental. *Id*. § 1508.1(g)(4).

59. If an agency does not prepare an EIS, it must prepare an environmental assessment ("EA") to determine whether an EIS is necessary. 40 C.F.R. §§ 1502.14, 1502.16.

60. In the absence of an EIS, the EA must "provide sufficient evidence" to support a Finding of No Significant Impact ("FONSI"). *Id*. § 1508.9(a)(1). The evidence must demonstrate that the action "will not have a significant effect on the human environment." *Id*. § 1508.13.

61. Here, BLM failed to conduct an EIS as required by NEPA because of the significant effect on the human environment. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.14. A major federal action, such as an EIS, is one that "requires substantial planning, time, resources, or expenditure." *Nat'l Resources Defense Council, Inc. v. Grant*, 341 F. Supp. 356, 366 (March 15, 1972).

"Typically, a project is considered a major federal action when it is funded with federal money." *Southwest Williamson County Comty. Ass'n v. Slater*, 243 F.3d 270, 278 (6th Cir. 2001).

62. BLM should not have issued a FONSI, finding that their closure of 612 miles that had been lawfully utilized for decades had no significant impact on the human environment. It is hard to believe that a travel plan such as this has no bearing on ". . . the relationship of present and future generations of Americans with that environment" due to the vast closures of once popular routes. *See* 40 C.F.R. § 1508.1(m).

63. The amount of planning and coordination that went into the TMP is considerable. Hundreds of miles were inventoried. The DR shows every route with their associated explanations for either opening or closing them. Further, there were thousands of "route reports" issued where upwards of twelve experts considered the natural, recreational, cultural, commercial, and historical values of each route. It is clear that substantial planning, time, and resources took place. Despite this, Defendants cherry-picked evidence that fit their narrative that no such harm to the human environment took place. The TMP should be set aside.

64. Finally, on February 19, 2025, the CEQ Director signed a notice of an interim rule removing CEQ's regulations from the Code of Federal Regulations. This notice explains how agencies may rely on the version of CEQ's regulations in effect when the challenged agency action was completed.[10]

65. BLM relied on the version of CEQ's regulations that called for implementing an EA and FONSI in lieu of an EIS.

66. Under *Marin*, this reliance is still questionable. The Court made clear that no statute

---

[10] *See* https://ceq.doe.gov/docs/laws-regulations/CEQ-Interim-Final-Rule-Pre-publication-Version.pdf

*ever* granted CEQ the authority to issue binding regulations. If this is the case, the notice does not justify BLM's baseless reliance on CEQ regulations for creating an EA and FONSI. In fact, it calls the entire TMP into question.

67. Whether the Court relies on prior CEQ regulations, requiring BLM to implement an EIS instead of an EA, or follows the new CEQ precedent, Plaintiff's request is the same. The Court should set aside the TMP.

## **PRAYER FOR RELIEF**

Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, it is appropriate and proper that a declaratory judgment be issued by this Court, declaring that the DR is unlawful.

Furthermore, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 65, it is appropriate and hereby requested that the Court issue a permanent injunction prohibiting Defendants from enforcing the new policy.

WHEREFORE, Plaintiffs respectfully request that this Court grant relief against Defendants as follows:

(1) Declare that Defendant's Henry Mountains and Fremont Gorge Travel Management Plan violates the Explore Act, Administrative Procedures Act, and National Environmental Policy Act;

(2) Hold unlawful and set aside the Henry Mountains and Fremont Gorge Travel Management Plan;

(3) Issue a permanent injunction against Defendants, as well as all agents, administrators, employees, or other persons acting on behalf of the Defendants from enforcing the Henry Mountains and Fremont Gorge Travel Management Plan;

(4) Award Plaintiffs their costs and expenses incurred in bringing this action, including, but not limited to, reasonable attorney fees pursuant to 28 U.S.C. § 2412; and

(5) Grant such other and further relief as the Court deems equitable, just, and proper.

Respectfully submitted on this 10th day of April, 2025.

BLUERIBBON COALITION, INC.

*/s/ Isabella Eldridge*
Isabella Eldridge
*Attorney for Plaintiffs*