# EXHIBIT A

"BRC TMP Comment"

**BlueRibbon Coalition**
P.O. Box 5449
Pocatello, ID 83202
208.237.1008
brc@sharetrails.org

**Ben Burr, Executive Director**                                                                                 June 9, 2024
BlueRibbon Coalition
P.O. Box 5449
Pocatello, ID 83202

**BLM Richfield Field Office**
150 East 900 North
Richfield, UT 84701

BlueRibbon Coalition (BRC) is writing to provide feedback for the Henry Mountains/Fremont Gorge preliminary map alternatives. BRC is a national non-profit organization that champions responsible recreation and encourages a strong conservation ethic and individual stewardship. We champion responsible use of public lands and waters for the benefit of all recreationists by educating and empowering our members to secure, protect, and expand shared outdoor recreation access and use by working collaboratively with natural resource managers and other recreationists. Our members use motorized and non-motorized means of recreation, including OHVs, horses, mountain bikes, snowmobiles, and hiking to enjoy federally managed lands throughout the United States, including those of the Bureau of Land Management. Many of our members and supporters live in Utah or travel across the country to visit Utah and use motorized vehicles to access BLM managed lands throughout the state. BRC members visit the Henry Mountains/Fremont Gorge travel area for motorized recreation, snowmobiling, sightseeing, photography, rockhounding, hunting, wildlife and nature study, camping, observing cultural resources, and other similar pursuits. We would like to add our support to any comment submitted by Utah Public Lands Alliance, Sage Riders, Ride with Respect, Castle Country OHV Club, Wayne County, Garfield County, PLPCO, Garfield County Rough Riders and any other individuals or organizations that advocate for motorized use. BRC members and supporters have concrete, definite, and immediate plans to continue such activities in the future.

**Organized Events**

Many of our members hold organized events that include organized rides in this area. A significant portion of the education mission of organizations like ours and the fundraising that supports organizations like ours comes from these organized events, and we see the continuation of these events as an integral expression of protected rights including freedom of speech and freedom of assembly. We believe these events are protected by the First Amendment and believe they are crucial to clubs and organizations.

Businesses in Ticaboo have been successfully growing events. These events bring hundreds of visitors to Ticaboo and the rest of Wayne and Garfield County during months that are otherwise slow for tourism. With areas like Moab moving to restrict events that cater to motorized recreation users, we expect areas like Ticaboo, Escalante and Hanksville to become desirable locations for more events. We are concerned that BLM will restrict permitting organized events. If BLM also closes routes in the Henry Mountain/Fremont Gorge travel area that aren't located in areas with restrictive designations, it will cause irreparable damage to the local economy of these communities that surround the area, who will have fewer options to attract event-based tourism.

**NEPA**

The Bureau of Land Management is required to show a broad range of alternatives through the NEPA process. We request that BLM develop an Alternative for this EA that keeps all mileage of routes open as a recreation friendly alternative. While many BRC members access this area in OHVs, referring to the alternative as an OHV alternative fails to recognize that a more extensive network of open routes also benefits recreation users who access the area through other means or for the dispersed camping opportunities. BLM often creates a "conservation" alternative, then it is typical to present several other alternatives that include varying levels of closures and restrictions from the baseline. That BLM has conditioned itself to believe that it must never expand or enhance recreation access through travel planning processes is an inherent and fundamental flaw of this process and violation of NEPA. This inequitable privilege of one stakeholder's interest over the interests of other stakeholders taints the integrity of the NEPA process. BLM should form a range of alternatives where each of the alternatives accomplishes the purpose and need of the project. The purpose and need of this plan is to create better management strategies, not to simply close and restrict use. Closure is not management.

**Dispersed Camping**

We do not support closing dispersed camping and limiting routes to areas of high value would limit access for campers. BRC believes that all users can and should be accommodated. This plan should ultimately identify reasonable standards for allowing dispersed camping. Keeping

open roads will allow use for dispersed camping and help mitigate impact as campers won't be concentrated into small areas. Any closures of spur routes that provide access to dispersed camping in this travel plan will only likely displace users onto the designated wilderness. Management strategies should be exhausted before restrictions and closures of areas to any type of recreational use. Each dispersed camping user group seeks a different type of experience on public land that often requires different access requirements, trail conditions/maintenance standards, remoteness, and locations with high scenic and recreational value. In many cases spurs, pullouts, and routes near bodies of water and unique geological formations are what determine the value of a dispersed camping site.

**Economic Benefits for Motorized Recreation**

Local communities rely on motorized recreation for economic opportunities. There has been a surge of use throughout the nation on public lands as well as in the Henry Mountain/Fremont Gorge travel area. Local groups have worked hard to put the area on the map so that they could reap the economic benefits. Closing roads would greatly hinder economic opportunity in Hanksville, Torrey, Boulder, Ticaboo and other surrounding communities. Many local organizations and businesses recognize the influx of traffic and believe that any user conflict can be mitigated through better signage and education. It is important to note the influx of traffic is caused by the closure of hundreds of miles of routes in other OHV areas such as San Rafael Desert and Labyrinth Rims/Gemini Bridges and adjacent wilderness areas, national parks, and national monuments. Therefore the BLM needs to provide as many areas as possible to these user groups.

According to the Bureau of Economic Analysis, outdoor recreation had a record breaking year in 2022. Outdoor recreation now accounts for over $1 trillion in economic activity. For reference, the oil and gas industry is $812 billion. Outdoor recreation is popular. It is an economic juggernaut.

Yet, public land agencies act as if this nearly $1 trillion dollar industry is optional or an afterthought. Instead of building new roads, trails, campgrounds, and infrastructure to accommodate the new growth in outdoor recreation, land managers are relentlessly closing public lands for the public to use. It doesn't make any sense. A deeper dive into the numbers reveals that the engine driving this record-breaking growth is literally the millions of engines that find their way into the various forms of motorized recreation. Non-motorized forms of recreation account for $33 billion in economic value. Gear that is used in all forms of recreation accounts for $52 billion. Motorized forms of recreation account for a shocking $78 billion in economic value.

We have also seen that the economic data BLM relies on to find no significant impact from closures is insufficient or contradictory to the finding of no significant impact. For example in the Labyrinth Rims/Gemini Bridges plan, BLM estimated that the area received approximately 1.8 million visitor days per year. Of these visits 300,000 visitor days per year accounted for dispersed recreation on the motorized trail network by a wide range of user groups. BLM concluded that a nearly 30% reduction in routes would only result in a loss of 7,000 visitor days. If you spread these visitor days out across space and time, this substantial route closure hardly reduced any use. The BLM concluded that this route closure would therefore not cause any economic impact. If this is true, then the BLM can't argue that such a small reduction in use would result in the sizable ecological benefits they claimed.

We hope to see a more substantive economic analysis performed for the Henry Mountains TMA that truly accounts for the economic losses that will occur from route closures. If the use reductions aren't substantial, then we request to see the rationale and data BLM is relying on to claim that negligible use reductions are resulting in benefits to other resources.

**Users with Disabilities**

We recommend that the BLM use this planning process to finally begin to reverse its decades-long systematic discrimination against those with mobility impairment-related disabilities. In April 2022 the Department of Interior released its Equity Action Plan which states, "Public land visitation data collected from the Department's bureaus suggests that certain underserved communities are underrepresented as public land visitors, relative to their presence in the U.S. population at large." This includes persons with disabilities and limited physical access.

On his first day in office, President Joe Biden issued an "Executive Order On Advancing Racial Equity and Support for Underserved Communities Through the Federal Government." This executive order established "an ambitious whole-of-government equity agenda" which focuses on addressing "entrenched disparities in our laws and public policies," and mandates a "comprehensive approach to advancing equity for all, including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality."

Under this executive order, "The term 'equity' means the consistent and systematic fair, just, and impartial treatment of all individuals, including individuals who belong to underserved communities that have been denied such treatment, such as ... persons with disabilities...." Historically, there has been no group more greatly marginalized and excluded by public land management policies, and motorized travel management policies in particular, than people with

disabilities. Outdoor enthusiasts with ambulatory disabilities frequently rely on motorized travel as their sole means to enjoy recreating on public lands. Not everyone has the ability to hike into a remote wilderness area, but many such people are still able to drive Jeeps, side-by-sides, and ATVs, which are restricted to the designated motorized route network.

Management policies focused on "minimizing" the environmental impacts of motorized recreation has resulted in a dramatic decrease in motorized recreation opportunities on public lands over the last 20 years which has disproportionately impacted people with disabilities. Wilderness focused environmental groups with extreme ableist biases have pushed for more and more areas to be closed to motorized recreation and reserved exclusively for hikers, mountain bikers, and other "human powered" and "quiet use" forms of recreation in which many people with disabilities are unable to participate.

Every time motorized routes or areas are closed, people with disabilities that require the use of motorized means to access public lands are barred from those areas forever. There has been little recourse for such people in the past because the Americans With Disabilities Act does not require public land management agencies to consider disproportionate effects on the disabled community, but only requires that they be given access to public lands on equal terms with everyone else. As a result, the BLM has historically failed to give any real consideration to the impacts of motorized route closures on the disabled community when developing travel management plans.

The Biden Administration's focus on equity, however, changes the equation. While the ADA focuses only on equality of opportunity, equity inherently focuses on equality of outcome. Any policy that is facially neutral but disproportionately harms a disadvantaged or marginalized group is considered inequitable. The BLM is therefore required by this executive order and others mandating that federal agencies consider "environmental justice" in NEPA proceedings to consider whether any route closures in the Henry Mountains/Fremont Gorge Travel Management plan would disproportionately harm disabled users' ability to access public lands.

Any approach to travel management that presumes the superiority of non-motorized forms of recreation like hiking over motorized recreation, or that justifies closing motorized access on the basis that people can still hike on those routes, is inherently discriminatory toward people with disabilities. Any large-scale closures of existing routes would unfairly and inequitably deprive people with disabilities of the ability to recreate in the area using the only means available to them. It is imperative that the BLM consider the access needs of disabled users in drafting the alternatives for this travel plan and ensure that people with disabilities who depend on motorized means do not lose access.

We believe that BLM should start recognizing that route density baselines are the only way to adequately protect the access rights of the disabled to the recreation benefits of public land. We expect that ultimately, BLM will be required to managed 2.5 miles of routes for every square mile of land in a planning area, and we strongly encourage the BLM to develop a NEPA alternative labeled the "Disability Access Friendly Alternative" that maintains this baseline level of access.

**Cultural Resources**

Our members often include responsible observation and appreciation of cultural resources as a reason to explore public lands. For this reason we don't think the presence of cultural resource sites should be the primary justification for any closures. Instead of closures, BLM should invite BRC and other recreation-focused stakeholders to participate in the planning process and Section 106 consulting partners to ensure that all management tools are explored for preventing impacts to cultural resource sites. BLM *Manual 8140* identifies twelve direct and indirect conservation measures that can be used to protect cultural resources: Signing, Fencing/Gating, Patrol/Surveillance, Erosion Control (off-site), Fire Control (off-site), Stabilization, Erosion Control (on site), Fire Control (on-site), Detailed Recording, Relocation, Adaptive Reuse of Structures, and Archaeological Data Recovery Techniques.In almost all cases these management strategies would be preferable options to route closures.

In addition to the broad discussion on disability access we already mentioned, BLM should analyze what percentage of the neighboring tribal population includes members with mobility impairment disabilities. If neighboring tribal populations include members with disabilities, BLM must consider that closing routes to prevent access to cultural sites could very well result in loss of access to cultural sites to tribal members. A Record Of Decision that results in loss of access to cultural sites for tribal members would be a blatant violation of *Executive Order 13007* and the *American Indian Religious Freedom Act*. BLM should analyze how maintaining routes as open to motorized use enables BLM to comply with these requirements.

**Route Specific Analysis**

We want to make note that the route names in the draft alternative maps are different from the map and route names in the monitoring report. For example, In the monitoring report, route 9321 is labeled on the map as a route with a photo however, there is no report for that route or associated picture. In alternatives B-D this route is labeled as WYHM0072 and all or part of the route is proposed for closure. The route reports also don't reflect this route's name. This is just one of many examples we found as we were completing an analysis of the proposed closures and maps. The public does not have accurate information. If the BLM is proposing a route to be closed, it needs to in fact provide accurate information on the reasons for closure. This does not

exist and the discrepancies and inconsistencies within the maps and alternatives leave much room for concern and confusion. BLM is required to provide accurate, understandable information to the public, so that we can understand the BLM's rationale for management decisions. The documentation provided during this comment period simply wasn't sufficient for BRC and its members to provide substantive comments on a wide range of routes. The BLM can remedy this deficiency by opening a subsequent comment period that doesn't suffer from these deficiencies.

We strongly oppose the closure of any single track routes through this process. By their nature, single track routes leave a small footprint and minimal environmental impact. There are so few single-track routes in this area, that any loss of these routes would be unacceptable.

Routes that provide sole access to school trustlands that need to be maintained moving forward: WYBD0357, WYBD0355a, WYBD0353, GABD0503, GABD0120, GABD0120, GABD0512, GABD0512, WYHM0102, GAHM0495a, GAHM0494a, GAHM0498, GAHM0455, GAHM0454, GAHM5005, GAHM0487b, GAHM0415, GAHM0365a, GAHM0308, GAHM0493, GAHM0266, GABD0101, GABD0105, GABD0075, GAHM0235, WYBD0187, WYBD0192, WYBD0199, WYNC0021, WYNC0017b, WYBD0155a, WYBD0047, WYBD0014, GAHM0020, GAHM008, GAHM0092, GAHM0020 and WYHM0090.

There are many closures within all alternatives that completely close off access to an entire area. For example, GAHM0002 is one of two routes to access Thompson mesa, the other route is also proposed for closure in Alternative B. Closing access to GABD0512 would also close access to Fiddler Butte. Another concern is route, GAHM008 that provides access to Five Canyon. Every route along highway 95 provides easily accessible dispersed camping sites for those who do not have the capability to go into the backcountry. GAHM0020 is one of the most scenic routes within the travel area and needs to remain open.

The following routes provide access to Factory Butte, are highly used primarily by singletrack users: WYNC0066, WYNC0047c, WYNC0066a, WYNC0066, WYNC0096, WYNC0084, WYHM0090, WYHM013, WYHM0135d, WYHM0135, GAHM0023a.

The Henry Mountain portion of the travel area, especially in the southern region provides world class hunting. Closure of these routes will affect Utah DNR, guiding companies and local economies.

In the Fremont Gorge area we have particular concerns with closure proposals with the following routes that provide staging access for motorized access many of them including

access for snowmobiling which is extremely limited in this travel area, photography, dispersed camping and hunting: WYPM0461, WYPM0530, WYPM0505b, WYPM0525, WYPM0521, WYPM0520, WYPM0466 and WYPM0437.

The city of Escalante hosts an annual Art Festival where for a month period you can find artists from around the world using these routes to capture these scenic views in a variety of mediums. The economic impact needs to be thoroughly analyzed with regards to events in Torrey and Garfield County, hunting, photography and outdoor recreation that are the sole economic drivers within these communities.

Many of these routes are poorly maintained and currently extremely difficult to access. This is the responsibility of the BLM to maintain these roads. Just because the BLM has failed to adequately maintain these routes for public access is not a reason to close the routes.

**User Conflict**

"User conflict" is an inappropriate and often misapplied concept that has generally been created and emphasized by anti-motorized advocates who are looking for any opportunity to restrict or eliminate OSV use. Despite their aggressive litigation efforts, there are few, if any, court decisions that have forced an agency to restrict any motorized recreation based on alleged "conflict." Rather, the courts have generally upheld a reasoned agency conclusion designed to address any alleged "conflict." See, e.g., Wild Wilderness v. Allen, 871 F.3d 719, 728-729 (9th Cir. 2017); Pryors Coalition v. Weldon, 803 F.Supp.2d 1184 (D. Mont. 2011), aff'd, 551 Fed. Appx. 426 (9th Cir. 2013). There are many strategies that can be employed to manage the ever-growing human population that desires to recreate on BLM lands. We generally support the concept of "shared use." As long as overall visitation numbers are appropriate for the affected resources, motorized and non-motorized users can be compatible with one another so long as individual users understand designations and plan their activities accordingly. There will always be a handful of pathologically disgruntled individuals seeking their own private rejuvenation on BLM lands.. These outliers should not dictate policy or use designations, and should be handled in a similar way as children testing parental boundaries.

Contrasted to those using "conflict" in a transparent effort to put a thumb on the scales of management balance, there are legitimate concerns that usually reflect the simple fact there are too many people trying to enjoy the same areas at the same time. These "conflicts" can occur within user groups or modalities as often as they occur between them. The agency should consider strategies to publicize and manage these situations. One option might be to designate non-motorized companion trails along motorized routes or designate/groom non-motorized only trails to Wilderness or non-motorized land classification to reduce conflict of uses. Such efforts

might be coupled with a targeted information campaign to direct non-motorized uses to non-motorized land classifications. Another element might be to consider enhanced staging/parking for non-motorized users so as to provide better access to non-motorized areas. Finally, we have always been and remain strong advocates of an active and effective enforcement program, so that users who violate or choose to remain criminally ignorant of management prescriptions suffer meaningful adverse consequences. All users need to understand and respect the fact that their use of our public lands is a privilege to be shared with others under the terms established by applicable law.

### Conclusion

We would like to close by saying we support "shared use". As long as overall visitation numbers are appropriate for the affected resources, motorized and non-motorized users can be compatible with one another so long as individual users understand designations and plan their activities accordingly. Indeed, motorized and non-motorized recreation use often overlap as OHV's often increase accessibility to non-motorized recreational activities such as hiking, camping, equestrian use, etc. We also hold that responsible recreational use of public lands can exist in harmony with ecosystem needs.

Ben Burr
BlueRibbon Coalition
P.O. Box 5449
Pocatello, ID 83202
brmedia@sharetrails.org

Sincerely,

Ben Burr
Executive Director
BlueRibbon Coalition

Simone Griffin
Policy Director
BlueRibbon Coalition

Your new comment has been successfully submitted!

# Your Submission ID is PrelimRelease-1-500699429

Download as PDF