# EXHIBIT 2



June 10, 2024

David Mortenson
Field Manager
Bureau of Land Management
Richfield Field Office
150 East 900 North
Richfield, UT 84701

Letter submitted via email to blm_ut_rf_comments@blm.gov and via BLM's e-planning portal; referenced attachments sent via USPS First Class Mail

> Re:    *Travel Management Plan for the Henry Mountains and Fremont Gorge Travel Management Area, DOI-BLM-UT-C020-2018-0006-EA, Comments on Preliminary Alternatives*

Greetings:

Please accept the following comments submitted by the Southern Utah Wilderness Alliance (SUWA) regarding the preliminary alternatives for the Bureau of Land Management's (BLM) forthcoming Environmental Assessment (EA) for the Henry Mountains and Fremont Gorge Travel Management Plan ("TMP" or "Travel Plan"), DOI-BLM_UT-C020-2018-0006-EA.

In developing the EA and analyzing the varying impacts of alternative travel networks, BLM must ensure that the Travel Plan complies with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321-4370f; the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701-1785; the National Historic Preservation Act (NHPA), 54 U.S.C. §§ 300101-307108; the minimization requirements for route designations set forth in FLPMA's regulations, and all other applicable federal regulations and agency guidance applying these laws and regulations. BLM also must comply with Executive Orders 13,990 and 14,008 and Secretarial Order 3399.

## I.    Background

The Henry Mountains and Fremont Gorge travel management area encompasses nearly 1,500,000 acres of primarily BLM-managed lands. Spanning from Capitol Reef National Park to Canyonlands National Park and Glen Canyon National Recreation Area, the TMA includes at least three distinct landscapes: the Dirty Devil Canyon complex, the Henry Mountains, and the badlands surrounding Factory Butte and Wild Horse Mesa.

The Henry Mountains and Freemont Gorge area is rich in significant, irreplaceable cultural sites that reflect thousands of years of human history. The Dirty Devil canyon complex as well as the Henry Mountains have been identified by the Navajo Nation as an area of significance to the tribe because Navajo (Diné) used these areas to escape Kit Carson's roundup in the 1860s. The TMA also provides important habitat for desert bighorn sheep, Rocky Mountain elk and pronghorn and includes designated critical habitat for the Mexican spotted owl.

In 2008, the Richfield field office finalized the Richfield Resource Management Plan (RMP). Bureau of Land Mgmt., *Richfield Field Office Record of Decision and Approved Resource Management Plan* (Oct. 2008) (Richfield RMP). That plan designated roughly 4,277 miles ofroutes throughout the field office, including about 1,800 miles within the Henry Mountains and Fremont Gorge TMA. A significant number of routes within the TMA are fully reclaimed remnants of old seismic exploration or simply do not exist on the ground; others are user-created two tracks, the use of which has never been properly or comprehensively analyzed. Designated routes weave in and out of fragile riparian areas, traverse directly through cultural sites and fragment significant wildlife habitat.

Concerned about BLM's failure to comply with the NHPA, FLPMA, the Executive Orders and minimization criteria, and other laws and regulations, SUWA and a coalition of conservation organizations challenged the Richfield RMP and TMP—along with five other Utah field office RMPs and TMPs in court. A federal judge held that several aspects of the Richfield RMP and travel management plan violated environmental and cultural preservation laws. *See generally S. Utah Wilderness All. v. Burke*, 981 F. Supp. 2d 1099 (D. Utah 2013). With regard to the Richfield TMP, the court held that BLM (1) failed to consider or apply the minimization criteria set forth in 43 C.F.R. § 8342.1 and (2) failed to make comply with the NHPA's requirement to make a reasonable and good faith effort to identify cultural resources. *S. Utah Wilderness All.*, 981 F. Supp.2d at 1105-06, 1109-10.

Following its decision, the court issued a "Remedy Order" imposing an expedited phased deadline for the BLM to consider and apply the minimization criteria and issue a new NEPA analysis and Record of Decision and to perform Class III inventories under the NHPA and make new findings regarding adverse effects for all open routes in the Richfield field office's "limited to designated routes" area. *S. Utah Wilderness All.*, No. 2:12CV257DAK, 2015 U.S. Dist. LEXIS 67251, at *12-14 (D. Utah May 22, 2015). The Remedy Order required BLM to complete its work in the former Henry Mountains Field Station planning area within **one year**, in other words, requiring BLM to complete the necessary work by 2016. *Id.* at 13. The court acknowledged that it imposed strict deadlines but reasoned that the timing for re-doing the flawed plan was critical because

> without evidence that the designated routes are supported by the minimization criteria and without any study of the impacted historical artifacts, harm could occur to the area at any time that the proper designations are not in place and the court believes expedited action is required.

*Id.* at *12-13.

In the wake of the court's Richfield RMP and travel plan decision, the SUWA-led organizations, BLM and three OHV groups signed a settlement agreement that established a schedule and process for BLM to update eleven travel plans across eastern and southern Utah. Settlement Agreement, *S. Utah Wilderness All. v. U.S. Dep't of the Interior*, No. 2:12-cv-257 (D. Utah Jan. 13, 2017) (Docket No. 513) (Settlement Agreement). Because BLM had already started some components of travel planning as part of the 2015 Remedy Order, the process for the Henry Mountains and Fremont Gorge TMA was slightly different than other travel plans. *See* Settlement Agreement ¶ 18. Under the Settlement Agreement, BLM is not required to conduct public scoping but is required to conduct Class III cultural resource surveys on all routes that will be designated as open in the TMP. *Id.* ¶¶ 18, 24.a. BLM committed in the Settlement Agreement to complete Henry Mountains and Fremont Gorge Travel Plan by November 30, 2019.

In the nine years since the court's remedy order and the four and a half years since BLM was required to complete a new travel plan, motorized use in the TMA has increased significantly. Because of the flawed plan and lax enforcement, motorized impacts to natural and cultural resources has also increased substantially. Routes that were once non-existent on the ground are now being driven, creating new impacts. In the absence of enforcement, OHV users are pioneering new routes and motorized use is extending farther into the backcountry. It is critical that BLM timely complete a new travel plan that complies with Federal law and regulations.

The Henry Mountains and Fremont Gorge TMP is a long-overdue opportunity to develop a reasonable, manageable and forward-thinking blueprint that ensures public access to the outdoors while preserving the backcountry and meeting BLM's duty to minimize damage to cultural and natural resources. Utah's public lands and natural resources are under increasing threat from the impacts of climate change and skyrocketing visitation. Precisely because of these challenges, thoughtful and deliberate travel planning is critical. The planning process is an opportunity to find a balance between motorized vehicle use, preservation of sensitive resources and opportunities for quiet recreation.

## II.    Routes Cannot Be Designated in OHV-Closed Areas

In its preliminary alternative maps and GIS data, BLM improperly included routes that the agency does not have the authority to open to motorized vehicle use. Specifically, BLM includes routes in the preliminary alternatives that are in OHV-Closed *areas*.

OHV area designations are RMP-level decisions that determine whether broad areas are OHV-Open—"where all types of vehicle use is permitted at all times, anywhere in the area"; OHV-Closed—"where off-road vehicle use is prohibited"; or OHV-Limited—where OHVs are limited in certain ways, often to designated routes.[1] 43 C.F.R. § 8340.0-5(f), (g), (h); Bureau of Land Mgmt., *1626 – Travel and Transportation Manual* § 7 (2016) (Manual 1626). The Richfield RMP designated 209,900 acres as OHV-Closed. RMP at 122. In other words, OHV use is prohibited within those 209,900 acres. Despite this prohibition, in its preliminary alternative route networks, BLM includes roughly 34 miles of routes in OHV-Closed areas. *See, e.g.*, SUWA Map_Routes in OHV Closed Areas (attached). This is problematic for several reasons.

---

[1] Pursuant to the Richfield RMP, 1,908,210 acres of the Richfield field office is "limited to designated routes." RMP at 19. Routes that are not designated as OHV-Open or OHV-Limited in the Richfield RMP are closed to OHV use.

First, the maps do not accurately reflect the decision space available to the BLM in the TMP process. BLM does not have the authority to designate routes in OHV-Closed areas as open or limited in this implementation-level planning process. While many of the routes displayed in OHV-Closed areas are closed in all alternatives, simply including the routes and analysis *at all* improperly inflates the number and mileage of "closed routes" and does not accurately reflect the inventoried routes that BLM can consider designating.[2]

Second, BLM appears to be considering allowing motorized use on approximately five miles of routes in OHV-Closed areas. *See* SUWA Map_Routes in OHV Closed Areas (highlighting in blue routes BLM is proposing to designate as "open" or "limited" in OHV-Closed areas, including routes WYBD0364, WYBD0365, WYBD0315b,[3] WYBD0315f, WYBD0130b, WYBD0115, WYBD0347, WYBD0345). As discussed above, motorized use in OHV-Closed areas is prohibited and OHV area designations cannot be modified in implementation-level travel planning. Accordingly, BLM cannot allow motorized use on these routes.

In the draft EA, BLM must remove all routes in OHV-Closed areas from consideration and adjust mileages accordingly.

### III.    Wilderness Study Areas

BLM must manage WSAs "in a manner so as not to impair the suitability of such areas for preservation as wilderness." 43 U.S.C. § 1782. BLM "will protect the wilderness characteristics of all WSAs in the same or better condition that they were on October 21, 1976. Bureau of Land Mgmt., Manual 6330—Management of Wilderness Study Areas § 1.6.B (2012). In managing to prevent the impairment of wilderness characteristics, BLM will "prevent impairing activities" and continually monitor to "ensure continued suitability for designation as wilderness." *Id.* § 1.6.B.1.

All uses within a WSA, including the motorized vehicle use, must meet the non-impairment standard. BLM Manual 6330 § 1.6.D.6.b. Motorized vehicle use can only occur in WSAs "on primitive routes (or 'ways') identified by the BLM as existing on October 21, 1976" if the route was identified in the original wilderness inventory. *Id.* Even then, "[p]rimitive routes within WSAs may only be used to the extent that the physical impacts of the primitive route are not greater than existed on October 21, 1976." *Id.* "[T]he BLM must take action to ensure the route does not exceed the approximate conditions of impact to the wilderness characteristics that existed on October 21, 1976." *Id.* Furthermore, "[a]ny motorized/mechanized linear transportation feature located within [WSAs] will be identified in a transportation inventory as a motorized/mechanized 'primitive route' . . . *Primitive routes will not be made a part of the*

---

[2] Further compounding this problem is that BLM includes 196 additional miles of routes that are closed in all alternatives. Similar to including routes in OHV-Closed areas, including routes that are closed in all alternatives inflates the number of routes BLM purports to be *closing* as part of the TMP process.

[3] BLM's preliminary alternative GIS data does not accurately reflect the route designations in the 2008 Richfield RMP. According to that data, route WYBD0315b ended at the boundary of the OHV-Closed area. Preliminary Alternative A makes it look as though this route is currently open to motorized vehicles in the OHV-Closed area.

*transportation system.*" *Id.* (quoting Bureau of Land Mgmt., Manual 1626—Travel and Transportation Manual § 6.5.E (2016)) (emphasis added).

The Henry Mountains and Fremont Gorge TMA contains 11 WSAs: Little Rockies, Dirty Devil, Fiddler Butte, Fremont Gorge, French Spring/Happy Canyon, Horseshoe Canyon North, Horseshoe Canyon South, Mount Ellen/Blue Hills, Bull Mountain, Mount Hillers and Mount Pennell. Nine of these WSAs have primitive routes that BLM erroneously designated in the Richfield RMP as open to motorized vehicles, for a total of about 44 miles of routes in WSAs. *See* Richfield RMP at 145. The Richfield RMP makes clear that motorized use within WSAs will continue only on a "conditional basis . . . as long as the use of these routes does not impair wilderness suitability." *Id.* at 143. Use of these primitive routes is also conditioned on "user compliance and non-impairment of wilderness values." *Id.*

Motorized use within the these WSAs violates FLPMA, BLM Manual 6330 and the Richfield RMP. As an initial matter, the primitive routes never should have become part of the transportation system in the Richfield RMP. *See* BLM Manual 6330 § 1.6.D.6.b. To the extent that motorized use has been *allowed* on these primitive routes, that use is impairing wilderness characteristics, expanding the physical impact of the primitive routes beyond that which existed in 1976 and facilitating illegal OHV use in the WSAs. For instance, on route WYBD0351 in the Horseshoe Canyon South WSA, motorized use has substantially increased the footprint of the route, damaging vegetation and soils as well as the appearance of naturalness within the WSA. Similarly, motorized use on GAHM0498 in the Mt. Pennell WSA is damaging wilderness characteristics as motorized users attempt to bypass washouts and drive well outside the footprint of the route, trampling vegetation and causing deep ruts to form. Motorized use on GAHM0498 is also damaging fragile riparian areas. *See* BLM Manual 6330 § 1.6.D.5.b.iv.B (noting that closing routes in WSAs is appropriate where "[d]eterioration of the route has occurred, causing drivers to bypass a section(s) of the route (for example, the surface of a primitive route has eroded causing drivers to bypass the original route and drive parallel to it))."

Motorized use on primitive routes in WSAs is also facilitating illegal off-route use. For example, OHV use on route GAHM0061 in the Mount Ellen/Blue Hills WSA is facilitating illegal off-route use to the extent that BLM identified two unauthorized routes in the preliminary alternatives for the TMP: GAHM0062 and GAHM0064.

Because of impacts to wilderness suitability, under Manual 6330 and the Richfield RMP, BLM should close all primitive routes in the WSAs to motorized vehicles.

BLM also appears to be considering designating *new* routes in WSAs, beyond the 44 miles that were designated in the Richfield RMP. BLM is considering designating 13 miles of new routes in WSAs in preliminary Alternative C and 26 miles of new routes in WSAs in preliminary Alternative D. *See* SUWA Map_New Routes in WSA_NA_Alt C (attached); SUWA Map_New Routes in WSA_NA_Alt. D (attached). However, there is no indication that these new routes were identified by BLM as existing on October 21, 1976 in the original wilderness inventory. And there is no question that designating these routes would lead to new damage and impair wilderness suitability. Accordingly, BLM must remove all of these routes from consideration in any alternative.

### IV.    Minimization Criteria

In the Henry Mountains and Fremont Gorge TMP EA, BLM must apply the "minimization criteria" set out in 43 C.F.R. § 8342.1.[4] Federal courts have made clear that federal agencies must meaningfully apply and implement—not just identify or consider—the minimization criteria when designating each area or trail, and to demonstrate in the record how they did so. *See, e.g.*, *WildEarth Guardians v. U.S. Forest Serv.*, 790 F.3d 920, 929-32 (9th Cir. 2015); *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 746 F. Supp. 2d 1055, 1071-81 (N.D. Cal. 2009). Under the minimization criteria, all route designations "shall be based on the protection of the resources of the public lands, the promotion of the safety of all the users of the public lands, and the minimization of conflicts among various uses of the public lands." In meeting these goals, BLM must comply with the following criteria:

> (a)  Areas and trails shall be located to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability.

> (b)  Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats. Special attention will be given to protect endangered or threatened species and their habitats.

> (c)  Areas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.

> (d)  Areas and trails shall not be located in officially designated wilderness areas or primitive areas. Areas and trails shall be located in natural areas only if the authorized officer determines that off-road vehicle use in such locations will not adversely affect their natural, esthetic, scenic, or other values for which such areas are established.

43 C.F.R. § 8342.1.

BLM's obligation to minimize impacts to natural resources applies both to the travel network as a whole as well as individual route designations. *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 932 (9th Cir. 2015); *S. Utah Wilderness Alliance*, 981 F. Supp. 2d at 1104 (same, citing cases). Minimize refers "to the <u>effects</u> of route designations, i.e. the BLM is required to place routes specifically to minimize 'damage' to public resources, 'harassment' and

---

[4] *See also* Executive Order No. 11644 (1972), as amended by Executive Order No. 11989 (1977).

'disruption' of wildlife and its habitat, and minimize 'conflicts of uses." *Ctr. for Biological Diversity*, 746 F. Supp. 2d at 1080 (emphasis in original).

## V.    Utah RMP Settlement Agreement

BLM must adhere to the following documentation requirements in preparing the Henry Mountains and Fremont Gorge TMP:

- BLM must identify the purpose and need for each route, taking "into account information indicating if a route is no longer used by motorized vehicles, is revegetating or reclaiming, and/or is impassable to motorized vehicles. A route without an identified purpose and need will not be proposed as part of the dedicated route network in any action alternatives in the NEPA document." Settlement Agreement ¶ 17a.

- BLM must identify "any public land resources . . . that may be affected by motorized vehicle use of the route." Settlement Agreement ¶ 17b. These public land resources are set forth in 43 C.F.R. § 8342.1(a) and "include, but are not limited to, identified cultural resources and public lands with BLM-inventoried wilderness characteristics, regardless of whether BLM administers or manages the subject public lands to maintain or enhance those resources" as well as "soil, watershed, vegetation, or other resources of the public lands." *Id.* ¶ 17c.

- "BLM will document in the route report how each alternative route designation will 'minimize damage' to affected [public land resources]. In each route report, BLM will include a brief narrative summary of how it has applied the designation criteria to the route for each alternative route designation." Settlement Agreement ¶ 17d.

- "BLM will explain in the NEPA document for each TMP how each proposed alternative route network will 'minimize damage' to 'resources of the public lands,'" including each of the wilderness-characteristics elements. Settlement Agreement ¶ 17e.

- BLM must "consider in the NEPA document at least one proposed alternative route network that would not designate for ORV use any route where BLM has determined that such use may 'damage,' 43 C.F.R. § 8342.1(a), BLM-inventoried wilderness characteristics," unless "the use is authorized by an existing right-of-way or other BLM authorization or by law." Settlement Agreement ¶ 17e.

## VI.    Executive Orders 13,990 and 14,008

Shortly after taking office, President Biden signed a series of executive orders highlighting the pressing threat of global climate change and directing federal agencies to help combat the climate crisis. On his first day in office, President Biden signed Executive Order (EO) 13,990, *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*, 86 Fed. Reg. 7073 (Jan. 25, 2021), announcing a national commitment to "immediately commence work to confront the climate crisis." EO 13,990 § 1. EO 13,990 establishes a national

policy to, among other things, reduce greenhouse emissions and "bolster resilience to the impacts of climate change." *Id.* It directs federal agencies to review all regulations, policies or similar agency actions that may be inconsistent with this mandate.

Executive Order 14,008 provides more detail regarding President Biden's expectation that federal agencies will play a pivotal role in combating the climate crisis. EO 14,008, *Tackling the Climate Crisis at Home and Abroad*, 86 Fed. Reg. 7619 (Feb. 1, 2021). President Biden committed to "deploy the full capacity of [federal] agencies to combat the climate crisis to implement a Government-wide approach that reduces climate pollution in every sector of the economy; increases resilience to the impacts of climate change . . . [and] conserves our lands, waters, and biodiversity . . . ." *Id.* § 201. EO 14,008 also directs the Department of the Interior (DOI) to work with stakeholders to identify and recommend steps toward conserving 30 percent of U.S. lands and waters by 2030. *Id.* § 216.

To implement these orders, the DOI promulgated *Department of the Interior Climate Action Plan.* Dep't of Interior, *Climate Action Plan* (2021).[5] In that plan, DOI committed "to effectively and efficiently confront and adapt to the challenges that climate change poses . . . [and] take concrete steps to adapt to and mitigate climate change impacts on its resources." *See id.* (Department of the Interior Policy Statement for Climate Adaptation and Resilience). The climate action plan identified nine institutional approaches to integrating climate adaptation into DOI's policies, programs and operations. *Id.* at 2-3. The plan also identifies vulnerabilities that directly impact DOI's mission as well as climate adaptation actions the Department plans to undertake for fiscal years 2021-2026.

BLM's Henry Mountains and Fremont Gorge travel plan must comply with DOI's climate action plan and incorporate DOI's institutional approaches to integrating climate change into this travel planning process. Those institutional approaches include using the best available science and traditional knowledge, mainstreaming climate change adaptation, maximizing co-benefits, and applying nature-based solutions and ecosystem-based approaches. *Id.* at 2-3.

In its travel planning analysis, BLM must use the best available information to consider existing and projected climate change vulnerabilities, risks and impacts and the role that OHV use on public lands plays in those impacts. Motorized vehicle use contributes significantly to greenhouse gas emissions. *See, e.g.*, Adam Switalski, *Off-highway vehicle recreation in drylands: A literature review and recommendations for best management practices*, 21 J. of Outdoor Recreation & Tourism 87, 88 (2018) (attached). OHV use also causes surface disturbance, thereby increasing erosion and the generation of dust, damage that exacerbates climate change impacts. *Id.; see also* Michael C. Duniway *et al.*, *Wind Erosion and dust from US drylands: a review of causes, consequences, and solutions in a changing world*, Ecosphere 10(3) 11-12 (2019) (attached) (recognizing the role that dust in the atmosphere—including from unpaved OHV route network—can affect global temperatures). In addition, closing sensitive areas to OHV use is a key part of climate adaptation that maximizes co-benefits to restore large-scale landscapes that provide critical wildlife habitat, protect limited water resources and reduce greenhouse gas emissions. Reducing the number of designated routes also supports DOI's

---

[5] Available at https://www.doi.gov/sites/doi.gov/files/department-of-interior-climate-action-plan-final-signed-508-9.14.21.pdf.

institutional approach to climate action that focuses and nature-based solutions and ecosystem-based approaches. Limiting motorized recreation reduces environmental vulnerability to climate change and is a cost-effective approach to increase ecosystem resilience, reduce greenhouse gas emissions and protect ecosystem services.

In addition to institutional approaches, DOI's climate action plan identified five vulnerabilities that impact its mission, including biodiversity and ecosystems. *See Climate Action Plan* at 4-11. DOI noted that it "is committed to enhancing biodiversity; sustaining ecological processes; promoting the health and function of ecosystems by sustaining fish, wildlife and place species; restoring native vegetation and natural ecosystem processes; preventing and addressing invasive species; and mitigating the impacts of wildland fire." *Id.* at 9. The plan further acknowledges that DOI must restore and reconnect degraded landscapes, enhance ecological connectivity and preserve significant landscapes. <u>Each of these goals would be served by reducing the number and mileage of OHV routes Henry Mountains and Fremont Gorge TMA and excluding OHVs from riparian areas</u>. OHVs also fragment wildlife habitat, degrade land and water resources, spread invasive species and damage landscapes. *See, e.g.*, Douglas S. Ouren *et al.*, *Environmental Effects of Off-Highway Vehicles on Bureau of Land Management Lands: A Literature Synthesis, Annotated Bibliographies, Extensive Bibliographies, and Internet Resources*, Open-File Report 2007-1353 (2007) (attached). Reducing OHV routes within the TMA is a cost-effective method of furthering DOI's climate goals.

Finally, for fiscal years 2021-2026, DOI has committed to a series of climate change adaptation actions. *Climate Action Plan* at 16-19. Reducing the dominance of OHVs on public lands is necessary to support these actions, particularly to promote climate-resilient lands, waters and cultural resources.

## VII.   National Environmental Policy Act

NEPA requires that agencies take a "hard look" at the environmental consequences of a proposed action and the requisite environmental analysis "must be appropriate to the action in question." *Metcalf v. Daley*, 214 F.3d 1135, 1151 (9th Cir. 2000); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). "NEPA 'prescribes the necessary process' by which federal agencies must 'take a "hard look" at the environmental consequences' of the proposed courses of action." *Pennaco Energy, Inc. v. U.S. Dept. of the Interior*, 377 F.3d 1147, 1150 (10th Cir. 2004) (quoting *Utahns for Better Transp. v. U.S. Dept. of Transp.*, 305 F.3d 1152, 1162—63 (10th Cir. 2002)) (citation omitted). The fundamental objective of NEPA is to ensure that an "agency will not act on incomplete information only to regret its decision after it is too late to correct." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1990) (citation omitted). In order to take the "hard look" required by NEPA, BLM must assess impacts and effects that include: "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, *whether direct, indirect, or cumulative.* Effects also include effects on Tribal resources and climate change-related effects." 40 C.F.R. § 1508.1(i)(4) (emphasis added).

NEPA regulations define "direct effects" as those that "are caused by the action and occur at the same time and place." *Id.* § 1508.1(i)(1). The regulations define "indirect effects" as those that are:

> [C]aused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects *related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.*

*Id.* § 1508.1(i)(2) (emphasis added). "Cumulative impacts" are defined as:

> [E]ffects on the environmenta that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such actions. Cumulative effects can result from individually minor but collectively significant effects taking place over a period of time.

*Id.* § 1508.1(i)(3). Accordingly, NEPA requires that BLM engage in a searching and detailed analysis on the environmental effects of its actions, as well as ongoing and foreseeable uses of land, such as mineral development (e.g., uranium, helium, oil and gas) and livestock grazing, and changes to land from other factors such as climate change.

Pursuant to NEPA, the Travel Plan EA must take a hard look at each alternative's direct, indirect and cumulative impacts to natural and cultural resources, including wildlife, soils, watersheds, vegetation, wildlife and air quality. Cumulative and indirect impacts include those from mineral development projects, domestic livestock grazing, and other foreseeable uses and impacts to the public lands managed by the Richfield field office and adjacent field offices, including impacts from the San Rafael Swell and San Rafael Desert TMPs, as well public lands managed by the National Park Service and U.S. Forest Service.

## VIII.   Richfield RMP

In the travel plan, BLM must consider the goals and objectives for the values and uses in the Richfield RMP. *See* Settlement Agreement ¶ 16(c); BLM Manual 1626 § 4.1. The Richfield RMP made several special management decisions to guide land management objectives for particular areas within the Richfield field office.

### a.   Natural Areas

The Richfield RMP designated 12 Natural Areas, totaling around 78,600 acres. Richfield RMP at 102. BLM committed to "[p]rotect, preserve, and maintain the wilderness characteristics (appearance of naturalness and outstanding opportunities for solitude or primitive and unconfined recreation) within these [N]atural [A]reas." *Id.* BLM further committed to manage these "primitive and backcountry landscapes to preserve their undeveloped character and scenic quality and to provide opportunities for primitive and unconfined recreational activities and

experiences of solitude." *Id.* Despite this commitment, BLM designated about 20 miles of motorized routes in these Natural Areas and is considering additional routes in Natural Areas in Alternatives C and D. *See* Richfield RMP Map 16; SUWA Map_New Routes in WSAs and Natural Areas, Alternative C; SUWA Map_New Routes in WSAs and Natural Areas, Alternative D.

Motorized use of currently-designated routes in Natural Areas is detracting from the wilderness values that BLM committed to protect. For instance, motorized use on route WYNCO0039 has led to erosion and off-route travel, which is detracting from the Wild Horse Mesa unit's appearance of naturalness. It is also impacting opportunities for solitude. Other routes currently designated as open to motorized use in Natural Areas in the RMP simply do not exist on the ground. If BLM were to re-designate these non-existent or reclaimed routes as OHV-Open or OHV-Limited in the forthcoming travel plan, it is reasonable to expect that OHV users would drive these routes and thereby cause significant new vehicle impacts which would degrade wilderness values.

Despite issues with designated routes, BLM is considering designating several *new* OHV routes in Natural Areas that will only exacerbate these issues. For instance, BLM is considering designating GAHM0487b in the Little Rockies Natural Area. Motorized vehicles are illegally using this "route;" one that is entirely redundant to route GAHM0487, a nearby route which serves as the boundary for the Natural Area. BLM's failure to effectively monitor and enforce the existing travel plan has led to illegal motorized use of this route, use that detracts from the area's appearance of naturalness as well as opportunities for solitude. Designating this route in the TMP to motorized use will only compound these problems.

To adequately protect the wilderness values of the Natural Areas within the Henry Mountains and Fremont Gorge TMP, BLM should close motorized routes in Natural Areas and routes that facilitate illegal motorized use within Natural Areas.

### b. Dispersed Camping

The Richfield RMP allows vehicle parking for dispersed camping within 150 feet of designated routes. Richfield RMP at 126. BLM must explicitly analyze the impacts of dispersed camping and off-route travel to access dispersed camping, including quantifying the acres potentially impacted by dispersed camping. Generic statements that there will be environmental impacts from dispersed camping is not sufficient.

### IX.    Cultural Resources

BLM has dual obligations when considering the impacts of its undertakings on cultural resources. Pursuant to Section 106 of the NHPA, BLM must "make a reasonable and food faith effort" to identify cultural resources that may be affected by an undertaking. 36 C.F.R. § 800.4(b)(1). Pursuant to NEPA, BLM must take a "hard look" at the effects of the proposed action. BLM must comply with both statutes when it undertakes travel planning.

**a. BLM Must Consider Adverse Impacts of its Undertakings on Cultural Resources**

Congress enacted the NHPA in 1966 to implement a broad national policy encouraging the preservation and protection of America's historic and cultural resources. *See* 54 U.S.C. § 300101. The heart of the NHPA is Section 106, which prohibits federal agencies from approving any federal "undertaking" unless the agency takes into account the effects of the undertaking on historic properties that are included in or eligible for inclusion in the National Register of Historic Places. 54 U.S.C. §§ 306108, 300320; *see also Pueblo of Sandia v. United States*, 50 F.3d 856, 859 (10th Cir. 1995). Section 106 is a "stop, look, and listen provision" that requires federal agencies to consider the effects of their actions and programs on historic properties and sacred sites before implementation. *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999).

To adequately "take into account" the impacts on archeological resources, all federal agencies must comply with binding Section 106 regulations established by the Advisory Council on Historic Preservation (Advisory Council). Under these regulations, the first step in the Section 106 process is for an agency to determine whether the "proposed [f]ederal action is an undertaking as defined in [Section] 800.16(y)." 36 C.F.R. § 800.3(a). Undertakings include any permit or approval authorizing use of federal lands. *Id.* § 800.16(y). If the proposed action is an undertaking, the agency must determine "whether it is a type of activity that has the potential to cause effects on historic properties." *Id.* § 800.3(a). An effect is defined broadly to include direct, indirect, and/or cumulative adverse effects that might alter the characteristics that make a cultural site eligible for listing in the National Register of Historic Places. *See id.* § 800.5(a)(1); *id.* § 800.16(i); 65 Fed. Reg. 77,698, 77,712 (Dec. 12, 2000).

The agency next "[d]etermine[s] and document[s] the area of potential effects" and then "[r]eview[s] existing information on historic properties within [that] area." 36 C.F.R. § 800.4(a)(1)-(2). "Based on the information gathered, . . . the agency . . . shall take the steps necessary to identify historic properties within the area of potential effects." *Id.* § 800.4(b). "The agency shall make a reasonable and good faith effort to carry out appropriate identification efforts." *Id.* § 800.4(b)(1).

If the undertaking is a type of activity with the potential to affect historic properties then the agency must determine whether in fact those properties "may be affected" by the particular undertaking at hand. *Id.* § 800.4(d)(2).[6] Having identified the historic properties that may be affected, the agency considers whether the effect will be adverse, using the broad criteria and examples set forth in section 800.5(a)(1). Adverse effects include the "[p]hysical destruction of or damage to all or part of the property," as well as "[i]ntroduction of visual, atmospheric or audible elements that diminish the integrity of the property's historic significant historic features." *Id.* § 800.5(a)(2)(i) & (2)(v). If the agency concludes that the undertaking's effects do not meet the "adverse effects" criteria—that is, the agency concludes that there *may* not be an

---

[6] The agency may also determine that there are no historic properties present or there are historic properties present but the undertaking will have no effect upon them, at which point it consults with the State Historic Preservation Officer and notifies relevant Native American tribes of its conclusion. *Id.* § 800.4(d)(1).

adverse effect from the undertaking—it is to document that conclusion and propose a finding of "no adverse effects." *Id.* § 800.5(b), 800.5(d)(1).

If the agency official concludes that there *may be* an adverse effect, it engages the public and consults further with the state historic preservation officer, Native American tribes, consulting parties, and the Advisory Council in an effort to resolve the adverse effects. *Id.* §§ 800.5(d)(2), 800.6.

### b. Reasonable and Good Faith Effort

As discussed above, BLM must "make a reasonable and good faith effort" to identify cultural resources. 36 C.F.R. 800.4(b)(1). Under the Settlement Agreement, "BLM will ensure Class III cultural resource surveys have been conducted for 100% of all routes that will be designated as open in the Henry Mountains and Fremont Gorge TMP." Settlement Agreement ¶ 24.a. BLM included more than 400 miles of *new* routes in its route inventory for the TMP. BLM must ensure that it has completed Class III inventories not only on the routes that are currently open to motorized use but also on routes it is considering designating as OHV Open and or OHV limited in the TMP.

### c. Hard Look

In addition to BLM's obligations under the NHPA, NEPA requires BLM to take a "hard look" at the environmental effects of a proposed action. *Silverton Snowmobile Club*, 433 F.3d at 781 (10th Cir. 2006). An EA must demonstrate "the agency's thoughtful and probing reflection of the possible impacts associated with the proposed project." *Id.* (quoting *Comm. To Preserve Boomer Lake Park v. Dep't of Tramsp.*, 4 F.3d 1543, 1553 (10th Cir. 1993)). Pursuant to NEPA, BLM must analyze all potential direct, indirect, and cumulative impacts to *cultural resources*, regardless of whether those cultural resources are eligible for listing in the National Register. *See* BLM Manual 8100 – The Foundations for Managing Cultural Resources (Public) .03.F (Dec. 3, 2004) ("Cultural resources need not be determined eligible for the National Register of Historic Places . . . to receive consideration under [NEPA]."). Though NHPA analysis is related to NEPA analysis, they are not one and the same. BLM must analyze all potential direct, indirect, and cumulative impacts to cultural resources.

### X.    Water Resources

The Henry Mountains/Fremont Gorge TMP EA must analyze impacts to water resources. OHVs can have significant impacts on water resources, including by accelerating erosion and sedimentation and elevating levels of turbidity. *See* Douglas S. Ouren *et al, supra* at 25; *see also* Bureau of Land Mgmt., *Richfield Field Office Proposed Resource Management Plan & Final Environmental Impact Statement* 4-40-41 (Aug. 2008) (Richfield RMP FEIS) (acknowledging that OHV use affects water quality "by causing surface disturbance, channeling surface runoff, changing vegetation structure, and reducing riparian-wetland function."). OHV routes with stream crossings are particularly problematic. Richfield RMP FEIS at 4-40-41. "Wheel cuts and tracks within [OHV travel] networks may serve as water conduits that channel and direct water flow containing sediments and contaminants into aquatic ecosystems." Douglas S. Ouren *et al.,*

*supra* at 25. OHV use can also impact water quality through spills and emissions. *Id.* "Spill or emission contaminants may include 1,3 butadiene, benzene and ethylbenzene, xylenes, and toluene." *Id.* The EA must analyze the potential impacts of the alternative route networks on water resources, including but not limited to waterbodies currently listed on the State of Utah's 303(d)'s list of impaired waterbodies.[7]

## XI.    Plants and Wildlife

Plants and wildlife are impacted by motorized travel in several ways. Motorized travel creates stress from noise disturbance, direct mortality by vehicle crushing and collisions, altered behavioral or population distributions, and fragmented habitat. *See* Douglas S. Ouren *et al.*, *supra* at 16-22. Beyond the physical impact from OHV use and OHV routes, "[n]oise from OHVs can travel miles in open landscapes and can negatively impact wildlife in a variety of ways including disturbance, avoidance, disruption of breeding habitat, reduction of migration routes, reduction of quality of habitat and loss of habitat." *See* Adam Switalski, *supra* at 89. These impacts can all lead to declines in local populations, and for some rare species, declines that impact their entire populations. *See* Douglas S. Ouren *et al.*, *supra* at 16-22.

### a.    Wildlife

The Henry Mountains and Fremont Gorge TMA encompasses important habitat for a number of wildlife species. It encompasses both "crucial" and "substantial" desert bighorn sheep habitat, as well as crucial mule deer habitat, substantial rocky mountain elk habitat and substantial pronghorn habitat. Big game "crucial" habitat is defined as "habitat on which the local population of a wildlife species depends on for survival because there are no alternative ranges or habitats available." (Utah Division of Wildlife Resources 2019).

The statewide management plans for mule deer, elk, bighorn sheep and pronghorn all highlight habitat loss, degradation and fragmentation to be critical factors in population declines of those species. *See, e.g.*, Utah Dep't of Wildlife Res., *Utah Mule Deer Statewide Management Plan* 7-8 (2019) (Mule Deer Statewide Plan)[8]; Utah Dep't of Wildlife Res., *Utah Statewide Elk Management Plan* 7 (2022) (Elk Statewide Plan)[9]; Utah Dep't of Wildlife Res., *Utah Bighorn Sheep Statewide Management Plan* 11 (2018) (Bighorn Sheep Plan)[10]; Utah Dep't of Wildlife Res., *Utah Pronghorn Statewide Management Plan* 5 (2017) (Pronghorn Statewide Plan).[11] The mule deer, elk and pronghorn plans all specifically acknowledge that OHV use results in the loss or degradation of habitat. Mule Deer Statewide Plan at 7-8; Elk Statewide Plan at 7; Pronghorn Statewide Plan at 5. Those plans also recognize that OHV use disturbs elk and mule deer during critical life stages, causing undue stress at times when species should conserve energy. *See* Mule Deer Statewide Plan at 11; Elk Statewide Plan at 11. With regard to bighorn sheep, human disturbance, including from OHV use, may cause sheep to change use areas and abandon certain

---

[7] Utah's current 303(d) list is a component of its approved 2024 Integrated Report – available online at https://deq.utah.gov/water-quality/2024-integrated-report.
[8] Available at: https://wildlife.utah.gov/pdf/bg/mule_deer_plan.pdf.
[9] Available at: https://wildlife.utah.gov/pdf/bg/elk_plan.pdf.
[10] Available at: https://wildlife.utah.gov/pdf/bg/bighorn-plan.pdf.
[11] Available at: https://wildlife.utah.gov/pdf/bg/pronghorn_plan.pdf.

habitats. *See* Bighorn Sheep Plan at 11. Human disturbance is also a possible stressor to bighorn sheep. *Id.*

Despite the well-documented damage that OHV use causes to wildlife species and their habitat, BLM is considering significantly increasing the miles of designated routes in mule deer, desert bighorn sheep, pronghorn and elk habitats in preliminary alternatives C and D. Rather than increase route designations, BLM should strive to reduce OHV routes in wildlife habitat in each of the action alternatives. The Travel Plan EA must thoroughly analyze impacts to wildlife and associated habitat from the alternative route networks.

### b. Special Status Species

There are a number of threatened and endangered species within the Henry Mountains and Fremont Gorge TMA, including but not limited to Mexican spotted owl, Southwestern willow flycatcher, Western yellow-billed cuckoo, Wright fishhook cactus, Winkler cactus, San Rafael Cactus and Barneby reed-mustard. *See* Richfield RMP FEIS at 3-50 to 54. The TMA also encompasses designated Critical Habitat for the Mexican spotted owl. BLM must engage in formal consultation with the U.S. Fish and Wildlife Service because the TMP and its authorization of OHV use "may affect" listed species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

Furthermore, BLM must ensure that it is complying with the conservation measures it committed to in the 2008 Richfield RMP Biological Opinion. For instance, BLM committed to "[i]mplement management strategies that maintain or improve degraded riparian communities; protect natural flow requirements; protect water quality; manage for stable non-eroding banks; and manage for year-round flows" U.S. Fish & Wildlife Serv., *Biological Opinion for the Richfield BLM Resource Management Plan* 112 (2008). BLM also committed to "[m]onitor condition of habitat in occupied, suitable, or potentially suitable habitat for listed and sensitive species to ensure maintenance of good to excellent ecological conditions." *Id.* at 113. With regard to travel planning, BLM is supposed to "[d]ecommission unnecessary roads and reclaim unauthorized illegal trails in habitats important to listed and sensitive species. *Id.* BLM must comply with this Biological Opinion as it develops the TMP.

### XII.    Revised Statute 2477

In 2005, the U.S. Tenth Circuit Court of Appeals held that BLM does not have the authority to conclusively adjudicate R.S. 2477 claims. *S. Utah Wilderness All. v. Bureau of Land Mgmt.*, 425 F.3d 735, 757 (10th Cir. 2005). This decision was cited in another Circuit opinion in 2009 where counties in southern Utah claimed that BLM illegally ignored their prior-existing R.S. 2477 rights in closing roads through a travel management plan.

> To be sure, we recognized in *S. Utah* that the BLM possessed the authority to "determin[e] the validity of R.S. 2477 rights of way for its own purposes." 425 F.3d at 757. But, importantly, nothing in federal law requires the BLM to do so. Thus, even though the County plaintiffs might prefer that the BLM informally adjudicate their purported rights-of-way, they may not, as the district court

15

correctly concluded, "shift their burden as R.S. 2477 claimants or shortcut the existing processes for determining their unresolved R.S. 2477 claims by insisting that the BLM import its [internal and] preliminary road inventory work on unresolved R.S. 2477 claims in 1991 and 1993 [prior to this court's decision in *S. Utah*] into its planning processes in formulating the 1999 Management Plan.

*Kane Cnty. v. Salazar*, 562 F.3d 1077, 1087 (10th Cir. 2009).

BLM Manual 1626, § 6.2 provides clear language on consideration of R.S. 2477 claims in travel management planning:

> Travel management planning is not intended to address the validity of any R.S. 2477 assertions. All RMPs and TMPs at a minimum should include the following statement with regard to R.S. 2477 assertions:

> A travel management plan is not intended to provide evidence bearing on or addressing the validity of any R.S. 2477 assertions. R.S. 2477 rights are determined through a process that is entirely independent of the BLM's planning process. Consequently, [this RMP/TMP] did not take into consideration R.S. 2477 evidence. The BLM bases travel management planning on purpose and need related to resource uses and associated access to public lands and waters given consideration to the relevant resources. At such time as a decision is made on R.S. 2477 assertions, the BLM will adjust its travel routes accordingly.

BLM should neither make determinations regarding R.S. 2477 claims as part of this planning process nor permit those assertions to influence its decisions regarding permitting motorized use. As reiterated by the Tenth Circuit Court of Appeals, the BLM cannot make determinations as to the validity of R.S. 2477 claims—only a court of competent jurisdiction can make a final determination.

In sum, BLM must not consider R.S. 2477 assertions in the travel planning process and should make this limitation explicit throughout the process.

### Conclusion

Thank you for your consideration of these comments. Please direct any questions and send any additional information to the undersigned point of contact.

Sincerely,

Laura Peterson
Southern Utah Wilderness Alliance
laura@suwa.org



## Alt D Routes within OHV-Closed Areas

— **Closed routes in OHV-Closed Areas**

— **Open routes in OHV-Closed Areas**

— **Inventoried routes**

■ **OHV-Closed Areas (2008 Richfield RMP)**

☐ **TMA Boundary**

0 3 6 9 12 Miles

# Henry Mountains/Fremont Gorge TMA New Routes in WSAs and Natural Areas, Alternative C



**Legend**

— Open or Limited Alt C Routes w/in WSAs that are not open in 2008 RMP - 13 miles

— Open or Limited Alt C Routes w/in Natural Areas that are not open in 2008 RMP - 2 miles

— Inventoried Routes

Wilderness Study Area

Natural Area

BLM-identified LWC (2008 Richfield RMP)

TMA Boundary

0  3  6  9  12 Miles

D. Callahan (6/6/2024) | Data: BLM | Project #652



**Legend**

— Open or Limited Alt D Routes w/in WSAs that are not open in 2008 RMP - 26 miles

— Open or Limited Alt D Routes w/in Natural Areas that are not open in 2008 RMP - 2 miles

— Inventoried Routes

▉ Wilderness Study Area

▉ Natural Area

▉ BLM-identified LWC (2008 Richfield RMP)

▢ TMA Boundary

0  3  6  9  12 Miles