# EXHIBIT 3



October 26, 2024

David Mortenson
Field Manager
Bureau of Land Management
Richfield Field Office
150 East 900 North
Richfield, UT 84701

Letter submitted via BLM's e-planning portal; referenced attachments sent via USPS First Class Mail

> Re:    *Travel Management Plan for the Henry Mountains and Fremont Gorge Travel Management Area, DOI-BLM-UT-C020-2018-0006-EA, Comments on Draft Environmental Assessment*

Greetings:

Please accept the following comments submitted by the Southern Utah Wilderness Alliance regarding the Bureau of Land Management's (BLM) draft Environmental Assessment (EA) for the Henry Mountains and Fremont Gorge Travel Management Plan ("TMP" or "Travel Plan"), DOI-BLM-UT-C020-2018-0006-EA.

SUWA, its members and supporters have a significant interest in the public lands encompassed by the Henry Mountains/Fremont Gorge Travel Management Area (TMA), which are valued for their abundant cultural resources, biological integrity and non-motorized recreation opportunities. SUWA members frequently visit these lands to, among other things, hike, camp, backpack, canyoneer, view wildlife, sightsee, view and appreciate cultural and historic resources, mountain bike and float the Dirty Devil River.

BLM must ensure that the Travel Plan complies with all aspects of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321-4370f; the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701-1785; the National Historic Preservation Act (NHPA), 54 U.S.C. §§ 300101-307108; the minimization requirements for route designations set forth in FLPMA's regulations, 43 C.F.R. § 8342, BLM Manual 1626, and all other applicable federal regulations and agency guidance applying these laws and regulations. BLM also must comply with executive Orders 13990 and 14008, and with the procedural and substantive terms of the Settlement

Agreement in the matter captioned *Southern Utah Wilderness Alliance, et al. v. U.S. Department of the Interior,* Case No. 2:12-cv-257 (D. Utah Jan. 13, 2017) (No. 513).[1]

## I.    Background

The Henry Mountains and Fremont Gorge travel management area encompasses nearly 1,500,000 acres of BLM-managed lands. Spanning from Capitol Reef National Park to Canyonlands National Park and down to Glen Canyon National Recreation Area, the TMA includes several distinct landscapes, including the Dirty Devil Canyon complex, the Henry Mountains, and the badlands surrounding Factory Butte and Wild Horse Mesa.

The Henry Mountains and Freemont Gorge area is rich in significant, irreplaceable cultural sites that reflect thousands of years of human history. The TMA also provides important habitat for desert bighorn sheep, Rocky Mountain elk and pronghorn and includes designated critical habitat for the Mexican spotted owl.

In 2008, the Richfield field office finalized the Richfield Resource Management Plan (RMP). Bureau of Land Mgmt., *Richfield Field Office Record of Decision and Approved Resource Management Plan* (Oct. 2008) (Richfield RMP). That plan designated roughly *4,277 miles* of routes throughout the field office, including more than *1,800 miles* within the Henry Mountains and Fremont Gorge TMA. A significant number of routes within the TMA are fully reclaimed remnants of old seismic exploration or simply do not exist on the ground; others are user-created two tracks, the use of and impacts from has never been properly or comprehensively analyzed. Designated routes weave in and out of fragile riparian areas, traverse directly through cultural sites and fragment significant wildlife habitat. The dust and noise from vehicles on designated routes often conflicts with non-motorized recreation in the TMA.

Concerned about BLM's failure to comply with the NHPA, FLPMA, the Executive Orders and minimization criteria, and other laws and regulations, SUWA and a coalition of conservation organizations challenged the Richfield RMP and TMP—along with five other Utah field office RMPs and TMPs in court. A federal judge held that several aspects of the Richfield RMP and travel management plan violated environmental and cultural preservation laws. *See generally S. Utah Wilderness All. v. Burke*, 981 F. Supp. 2d 1099 (D. Utah 2013). With regard to the Richfield TMP, the court held that BLM (1) failed to consider or apply the minimization criteria set forth in 43 C.F.R. § 8342.1 and (2) failed to comply with the NHPA's requirement to make a reasonable and good faith effort to identify cultural resources. *S. Utah Wilderness All.*, 981 F. Supp.2d at 1105-06, 1109-10.

Following its merits decision, the court issued a "Remedy Order" imposing an expedited phased deadline for the BLM to consider and apply the minimization criteria and issue a new NEPA analysis and Record of Decision and to perform Class III inventories under the NHPA and make new findings regarding adverse effects for all open routes in the Richfield field office's "limited to designated routes" area. *S. Utah Wilderness All.*, No. 2:12CV257DAK, 2015 U.S. Dist.

---

[1] A copy of the Settlement Agreement is available at BLM-Utah's Travel and Transportation webpage: https://www.blm.gov/programs/recreation/recreation-programs/travel-and-transportation/utah (last viewed Oct. 24, 2024).

LEXIS 67251, at *12-14 (D. Utah May 22, 2015). The Remedy Order required BLM to complete its work in the former Henry Mountains Field Station planning area within **one year**, in other words, requiring BLM to complete the necessary work by 2016. *Id.* at 13. The court acknowledged that it imposed strict deadlines but reasoned that the timing for re-doing the flawed plan was critical because

> without evidence that the designated routes are supported by the minimization criteria and without any study of the impacted historical artifacts, harm could occur to the area at any time that the proper designations are not in place and the court believes expedited action is required.

*Id.* at *12-13.

In the wake of the court's Richfield RMP and travel plan decision, the SUWA-led organizations, BLM and three OHV groups signed a settlement agreement that established a schedule and process for BLM to update eleven travel plans across eastern and southern Utah. Settlement Agreement, *S. Utah Wilderness All. v. U.S. Dep't of the Interior*, No. 2:12-cv-257 (D. Utah Jan. 13, 2017) (Docket No. 513) (Settlement Agreement). Because BLM had already started some components of travel planning as part of the 2015 Remedy Order, the process for the Henry Mountains and Fremont Gorge TMA was slightly different than other travel plans. *See* Settlement Agreement ¶ 18. Under the Settlement Agreement, BLM was not required to conduct public scoping but is required to conduct Class III cultural resource surveys on all routes that will be designated as open in the TMP. *Id.* ¶¶ 18, 24.a. BLM committed in the Settlement Agreement to complete Henry Mountains and Fremont Gorge Travel Plan by November 30, 2019.

In the nine years since the court's remedy order and the four and a half years since BLM was required to complete a new travel plan, motorized use in the TMA has increased significantly. Because of the flawed plan and lax enforcement, motorized impacts to natural and cultural resources has also increased substantially. Routes that were once non-existent on the ground are now being driven, creating new impacts. In the absence of enforcement, OHV users are pioneering new routes and motorized use is extending farther into the backcountry. It is critical that BLM timely complete a new travel plan that complies with Federal law and regulations.

The Henry Mountains and Fremont Gorge TMP is a long-overdue opportunity to develop a reasonable, manageable and forward-thinking blueprint that ensures public access to the outdoors while preserving the backcountry and meeting BLM's duty to minimize damage to cultural and natural resources. Utah's public lands and natural resources are under increasing threat from the impacts of climate change and skyrocketing visitation. Precisely because of these challenges, thoughtful and deliberate travel planning is critical. The planning process is an opportunity to find a balance between motorized vehicle use, preservation of sensitive resources and opportunities for quiet recreation.

## II.    Route Inventory, Baseline Data and Assumptions

### a.    Background

Establishing an accurate baseline from which to evaluate the environmental impacts of each alternative is critical to both analyze the environmental impacts of the alternative route designations and to apply the minimization criteria on both a travel-network-wide and individual route basis. Pursuant to NEPA, agencies must "describe the environment of the areas to be affected by the alternatives under consideration." 40 C.F.R. § 1502.15 (a). The description of the "affected environment" includes "existing environmental conditions." *Id.* § 1502.15(b). In *Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci*, the Ninth Circuit Court of Appeals stated that "without establishing . . . baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA." 857 F.2d 505, 510 (9th Cir. 1988). The court further held that "[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process." *Id.* at 510. Establishing an accurate baseline for a travel plan includes establishing the physical conditions and actual presence of routes on the ground. *See Or. Natural Desert Ass'n v. Rose*, 921 F.3d 1185, 1190 (9th Cir. 2019).

### b.    Baseline Assumptions Regarding Route Conditions

BLM contends that all the routes it is considering designating in the action alternatives—even if they were closed under the 2008 RMP—"have been subject to ongoing use" such that designating any route in the evaluated route network would not authorize construction of new routes. *See, e.g.*, EA at 22, 114, 119. BLM acknowledges that it may designate reclaimed routes but confusingly concludes, without evidence or citation, that impacts from designating reclaimed routes "are assumed to be similar to those involved with typical route maintenance." *Id.* at 22. BLM then relies on that assumption in its analysis of impacts to resource values to predict fewer impacts from the proposed route designations. *See, e.g.*, EA at 119 (declining to fully analyze impacts to wildlife and wildlife habitat because the TMP would not authorize "use of routes that have not already been subject to ongoing use [such that] no measurable change to the current level of habitat for wildlife species would be expected."); *id.* at 114 (declining to analyze impacts to migratory birds because "[r]outes in the TMA have been used for over 80-100 years"). BLM's contention that (1) evaluated routes exist on the ground such that designation would not constitute construction <u>and</u> (2) evaluated routes have been subject to ongoing use is inaccurate.

SUWA has conducted extensive fieldwork throughout the Henry Mountains TMA over multiple years. Our fieldwork demonstrates that in fact a significant number of routes within the total evaluated route network have reclaimed, do not exist on the ground or are simply washes without associated motorized use. These routes have not received "ongoing use" and designating reclaimed, non-existent routes or washes as OHV-Open or OHV-Limited will result in *new* surface disturbance and must be analyzed accordingly. For example, BLM contends that route WYBD0180 is primarily used by ATVs and UTVs and occasionally used by stock 4-wheel drive vehicles and that allowing use on this route would minimize soil erosion, habitat disruption and/or vegetation and further that relocating the route would create greater impacts. *See* BLM Route Evaluation, WYBD0180. SUWA's fieldwork demonstrates that this route does not exist

on the ground and that designating this route to motorized vehicles would result in new surface disturbance that extends beyond impacts from simple route maintenance.



Route WYBD0180 does not exist on the ground.

Similarly, Route WYHM0135d is a reclaimed or non-existent route that is closed to motorized vehicles but that BLM proposes to open to all vehicles in Alternatives C and D. *See* BLM Route Evaluation WYHM0135d. BLM claims this route is currently used by UTVs and ATVs and that opening the route will not result in new surface disturbance. See *id.* ("Allowing continued use of this existing route . . . would minimize the potential for new disturbances to documented resources from cross-country use or the need for construction of new routes."). SUWA's

fieldwork shows, instead, that opening this route to motorized vehicles will in fact lead to new surface disturbance. Those impacts must be analyzed as part of BLM's NEPA analysis.



WYHM0135d, which BLM proposes to open to all motorized vehicles in Alternatives C and D.

The following photographs from SUWA fieldwork provide only a few examples of routes that are reclaiming, do not exist on the ground or that are washes with no associated motorized use. Other routes or portions of routes that are similarly reclaiming, do not exist on the ground or that are washes not associated with motorized use within the route network that BLM proposes to open to motorized use include, but are not limited to: GABD0016; GABD0018; GABD0043; GABD0046; GABD0054; GABD0057a; GABD0509; GABD0513; GAHM0015a; GAHM0016; GAHM0021; GAHM0058; GAHM0058b; GAHM59; GAHM0085; GAHM274a; GAHM0293a; GAHM0360b; GAHM0365a; GAHM0407a; GAHM0417a; GAHM0454; GAHM0455; GAHM0455a; GAHM0460a; GAHM0493a; WYBD0022a; WYBD0023; WYBD0041; WYBD0141; WYBD0148; WYBD0149; WYBD0150; WYBD0158; WYBD0172; WYBD0310; WYBD0311b; WYBD0313; WYBD0313a; WYBD0340; WYBD0342; WYBD0345; WYHM0135c, WYHM0135d, WYNC0047, WYNC0083, WYNC0084, WYNC0085, WYNC0092, WYNC0094, WYNC0095a, WYNC01010.



BLM claims that opening WYBD0240 would not result in significant new surface disturbance.



WYBD0158 would be open to all motorized vehicles in all action alternatives.



BLM claims that GAHM0493a is currently being used by stock 4-wheel drive vehicles and opening this route will not result in new surface disturbance.

As illustrated with these examples, the TMA EA's environmental and minimization analysis relies on the demonstrably incorrect assumption that all routes the agency is considering designating exist on the ground and are presently being used to the extent that designating any route would not result in substantial new surface disturbance. However, simply claiming that opening non-existent routes would have similar impacts to route maintenance does not make it so. Designating routes for motorized vehicles authorizes immediate impacts from the vehicles that use those routes, including damage to cultural resources, soil resources, riparian areas, water quality, wildlife, wildlife habitat, native plants, wilderness characteristics and introduction of invasive plant species. By introducing motorized use onto routes that do not exist on the ground, that have fully naturalized, that are partially reclaiming or that are washes, BLM is actually creating *new* routes that must be analyzed accordingly.

Establishing an accurate baseline is essential to analyze potential impacts of a new travel network. *See e.g.*, *Great Basin Resource Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016). Because BLM failed to establish an accurate baseline, it cannot effectively analyze the environmental impact of the TMA's action alternatives. Nor can it accurately analyze whether various alternative route designations would minimize impacts to the resources identified in 43 C.F.R. § 8342.1 and the Settlement Agreement, as required by law and the Agreement.

### c.  Baseline Assumptions Regarding Evaluated Route Network

In its total evaluated route network, BLM carried forward 2,282 miles of routes "as linear features appropriate for route evaluations." EA at 16. However, BLM included more than 230

8

miles of routes in that evaluated route network that are closed across each alternative. *See* EA at 19-20.

Included in those 230 miles are routes within OHV-Closed *areas*. *See* SUWA Map_Routes in OHV Closed Areas. OHV area designations are RMP-level decisions that determine whether broad areas are OHV-Open—"where all types of vehicle use is permitted at all times, anywhere in the area"; OHV-Closed—"where off-road vehicle use is prohibited"; or OHV-Limited—where OHVs are limited in certain ways, often to designated routes.[2] 43 C.F.R. § 8340.0-5(f), (g), (h); Bureau of Land Mgmt., 1626 – Travel and Transportation Manual § 7 (2016) (Manual 1626). The Richfield RMP designated 209,900 acres as OHV-Closed. RMP at 122. In other words, OHV use is prohibited within those 209,900 acres.

By including routes in OHV-Closed areas, BLM does not accurately reflect the decision space available to it in the TMP process. Further, by including 230 miles of evaluated routes that would be designated as OHV-Closed in all alternatives, BLM improperly inflates the number and mileage of "closed routes" and skewed its environmental analysis accordingly.

### d. Inaccurate Alternative A

BLM claims that Alternative A, the no action alternative, "would continue the current designations from the 2008 TMP within the HMFG TMA boundaries." EA at 20. However, Alternative A in the EA is inaccurate. The EA shows multiple routes or portions of routes as OHV-Open in Alternative A that were not designated for such use in the Richfield RMP. The following routes or portions of routes are inaccurately represented in Alterative A as OHV-Open: GABD0506a; GAHM0028; GAHM0075; GAHM0127a; GAHM0362a; GAHM0411; GAHM0416a; GAHM0489d; GAHM0490; WYHM0044; WYHM0104; WYNC0010; GAHM0394; GAHM0409a. To accurately reflect the no action alternative, BLM must ensure that the route designations in Alternative A represent only those routes designated for motorized use in the 2008 Richfield RMP.

### e. Underlying Assumptions

BLM bases its alternative impact analysis on several contradictory or unsupported assumptions. Relying on these assumptions undermines BLM's impacts analysis. For instance, the EA states that "BLM assumes where no routes are designated open for motorized travel, instances of unauthorized off-route motorized travel will increase." EA at 22. BLM does not provide any citation or support for this claim. *Id.* However, BLM then also assumes that public land users will operate their OHVs in accordance with the TMP designations and the regulations. *Id.* This sort of internally inconsistent assumption only undermines BLM's analysis and overinflates the

---

[2] Pursuant to the Richfield RMP, 1,908,210 acres of the Richfield field office is "limited to designated routes." RMP at 19. Routes that are not designated as OHV-Open or OHV-Limited in the Richfield RMP are closed to OHV use.

impact of route closures while at the same time underestimating the damaging impacts of motorized vehicle designations.

### III. Travel and Transportation Management

#### a. Executive Orders, Minimization Criteria and Settlement Agreement

Executive Order 11,644, as amended by Executive Order 11,989, imposes a substantive obligation that BLM shall *locate* designated OHV trails in order to *minimize* damage to natural and cultural resources and conflicts with other existing or proposed recreational uses. These "minimization criteria" are set forth at 43 C.F.R. § 8342.1. The Settlement Agreement further specifies that BLM will minimize damage to "identified cultural resources and public lands with BLM-inventoried wilderness characteristics." ¶ 17.d.

Federal courts have repeatedly made clear that federal agencies must meaningfully apply and implement—not just identify or consider—the minimization criteria when designating each area (as open, closed or limited), system of designated trails, or individual trail, and to demonstrate in the administrative record how they did so. *See, e.g.*, *WildEarth Guardians v. Mont. Snowmobile Ass'n.*, 790 F.3d 920, 929-32 (9th Cir. 2015); *S. Utah Wilderness All.*, 981 F. Supp. 2d at 1104-06 (collecting and citing cases); *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 746 F. Supp. 2d 1055, 1071-81 (N.D. Cal. 2009).

Under the minimization criteria, all route designations "shall be based on the protection of the resources of the public lands, the promotion of the safety of all the users of the public lands, and the minimization of conflicts among various uses of the public lands." 43 C.F.R. § 8342.1. In meeting these goals, BLM must comply with the following criteria:

(a) Areas and trails shall be located to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability.

(b) Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats. Special attention will be given to protect endangered or threatened species and their habitats.

(c) Areas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.

(d) Areas and trails shall not be located in officially designated wilderness areas or primitive areas. Areas and trails shall be located in natural areas only if the authorized officer determines that off-road vehicle use in such locations will not adversely affect their natural, esthetic, scenic, or other values for which such areas are established.

43 C.F.R. § 8342.1(a)-(d). *See also* Bureau of Land Mgmt., *Manual 1626—Travel and Transportation Management Manual* § 4.1 (2016) ("[R]outes available to OHV use [shall] be located to minimize damage, harassment, disruption, and conflict with various resources.").

BLM's obligation to minimize impacts to natural resources applies both to the travel network as a whole as well as individual route designations. *Mont. Snowmobile Ass'n*, 790 F.3d at 932; *S. Utah Wilderness All.*, 981 F. Supp. 2d at 1104 (same, citing cases). Minimize refers "to the *effects* of route designations, i.e. the BLM is required to place routes specifically to minimize 'damage' to public resources, 'harassment' and 'disruption' of wildlife and its habitat, and minimize 'conflicts of uses.'" *Ctr. for Biological Diversity*, 746 F. Supp. 2d at 1080 (emphasis in original). Simply reducing the number and/or miles of routes and trails designated for off-road vehicle use is not evidence of compliance with the minimization criteria. *See id.* at 1080-81; *see also Mont. Snowmobile Ass'n*, 790 F.3d at 932.

In addition to the minimization criteria, BLM must comply with the Settlement Agreement. BLM is required to adhere to certain documentation requirements, including identifying each route's purpose and need, affected resources, resource impact and route-specific minimization alternatives. *See* Settlement Agreement § B.17(a)-(d). With regard to identifying a route's purpose and need, BLM must "identify all known current motorized and non-motorized use that occurs on the route." *Id.* § B.17(a) (emphasis added). BLM must also "take into account information indicating if a route is no longer being used by motorized vehicles, is revegetating or reclaiming, and/or is impassable to motorized vehicles." *Id.*

### b. Application of the Minimization Criteria

Here, BLM must demonstrate that it identified, considered and applied the Minimization Criteria on both a network-wide and route-by-route basis. Furthermore, routes must be located with the purpose of minimizing impacts to identified resources.

The TMP EA summarizes the general process BLM used and the factors it considered in developing the various travel plan alternatives. *See* EA at 17-18. However, the EA does not explain *how* BLM has or will apply that process to its proposed route designations in a way which satisfies the regulations' substantive requirements that BLM locate routes to minimize impacts.[3] Specifically, neither the EA nor the route reports, contain any meaningful discussion of how BLM has *applied* the minimization criteria (as opposed to merely considering them).

With regard to route network, alternative-wide minimization, BLM relies on comparing the miles or number of routes designated in each alternative with particular resources. *See generally* EA Ch. 3. BLM then uses the comparative mileages and numbers as a surrogate to <u>analyzing</u>

---

[3] *See also* Bureau of Land Mgmt., H-8342 Travel and Transportation Handbook § V.H.i (2012) ("Individual roads, primitive roads, and trails should be chosen with the transportation network goals in mind rather than just using all the inherited roads, primitive roads and trails.").

environmental effects and presumably in an attempt to comply with its duty to minimize impacts. This approach is flawed.

Simply comparing the mileage of routes that impact various resources in a table does not demonstrate BLM's compliance with its substantive duty to minimize impacts on both a route-by-route and alternative-wide basis. The duty to minimize goes to the *effects* of route designations, not simply the number or mileage of route designations. Comparing number of routes or mileage of routes and choosing an alternative with less "mileage" of impact does not in itself demonstrative that BLM has minimized effects.

For instance, routes that damage riparian areas and streams will cause significant impacts beyond what can be captured in a simple comparison of numbers or percentages of routes near a resources. Riparian areas are disproportionately important in dry lands. *See* Adam Switalski, *Off-highway vehicle recreation in drylands: A literature review and recommendations for best management practices*, J. of Outdoor Recreation & Tourism, Vol. 21, 87-96 at 89 (2018) (attached). Riparian areas in drylands "only account for a small percentage of the land base, [but] they are the most productive lands and provide fish and wildlife habitat, water supply, cultural and historic values, and economic values." *Id.* at 89. Accordingly, even one route or relatively small route mileage that damages a riparian area may have a disproportionate impact that cannot be captured through a comparison of miles of routes near a given resource.

Furthermore, the relative *condition* of a particular route is an important aspect of understanding its impact on various resources. The condition of routes is not captured in BLM's comparative figures. *See* EA 55-60[4]; *see also* Bureau of Land Mgmt., *San Rafael Swell Travel Management Plan (TMP) Draft Environmental Assessment*, DOI-BLM-UT-G020-2019-0019-EA 92 (2024) (acknowledging routes that are eroded contribute more to total dissolved solid loading in riparian areas). Rather than simply compare the mileage of routes associated with a resource, BLM must describe how its proposed route designations comply "with the objective of minimizing impacts."[5] *Idaho Conservation League v. Guzman*, 766 F. Supp. 2d 1056, 1073 (D. Idaho 2011); *Wildlands CPR v. U.S. Forest Serv.*, 872 F. Supp. 2d 1064, 1082 (D. Mont. 2012).

BLM's approach to route-by-route minimization is similarly problematic. In each route evaluation form, BLM purports to explain how it addresses the minimization criteria on a route-by-route basis. But, despite cataloging a host of special resource concerns for each route, BLM generally fails to explain how it *applied* the minimization criteria, especially when designating a route as OHV-Open or OHV-Limited.

Instead, BLM relies on a number of boilerplate rationales that are themselves internally inconsistent, illogical and arbitrary. For instance, BLM regularly states it will be allowing "continuing" use on closed routes that the agency acknowledges are reclaiming. BLM then

---

[4] The EA includes a figure of "Routes in watersheds with high erosion potential," but the EA declines to describe how it determined which watersheds have "high erosion potential" and still fails to discuss the condition of routes within watersheds or near riparian areas, perennial streams, intermittent/ephemeral streams or wetlands. EA at 56-60.

[5] *See also* BLM Manual 1626 § 4.1 (requiring BLM to demonstrate compliance with the minimization criteria by clearly linking RMP goals and objectives to the minimization criteria and further requiring BLM to *explain* how this minimization goal is achieved).

claims that designating those closed routes will somehow minimize impacts by keeping vehicles on trails and reducing surface disturbance. In fact, BLM would be opening routes to motorized vehicles and introducing impacts where none are currently occurring. *See, e.g.*, BLM Route Evaluation GAHM0023a (acknowledging that the route is reclaimed but nevertheless stating that continued use will minimize the potential for new disturbance); BLM Route Evaluation GABD057a (recognizing that this route is not open to motorized vehicles and is reclaiming but asserting that "continued use" would minimize damage to documented resources). BLM also repeatedly states that opening routes to motorized vehicles would minimize damage because BLM would not have to re-locate or construct a new route. *See, e.g.*, BLM Route Evaluation GABD0513; BLM Route Evaluation WYHM0135d. However, whether relocating or constructing a route would cause more impacts is irrelevant. There is no requirement that BLM relocate or construct new routes in place of routes it decides to close or leave closed. BLM also states repeatedly that designating a route would minimize impacts because it would minimize the potential for cross-country OHV use. *See, e.g.*, BLM Route Evaluation GAHM0417a. BLM provides no support for this unsubstantiated claim.

BLM's conclusory and unsupported statements in the route evaluations do not amount to route-specific application of the minimization criteria.

### c.  BLM Must Select a Modified Alternative B

Although BLM's current attempt at complying with the minimization criteria is problematic, among the alternatives BLM is considering in the draft EA, Alternative B is the only option that remotely complies with the minimization criteria. BLM should modify Alternative B to close some additional routes to be considered the alternative that "prioritize[s] the conservation of sensitive resources." EA at 20. Specifically, BLM should change the designation of the following routes, or identified portions of routes, to OHV-Closed in Alternative B to prioritize the conservation of sensitive resources:

> GABD0507; WYHM0127a; GAHM0316; GAHM360; GAHM0416e; GAHM0442c; GAHM0492b; WYBD0146; WYBD0144; WYBD0145; WYBD0149; WYBD0148; WYBD0150; WYBD0158; WYBD0172; WYHM0065; WYHM0130b; WYHM0135; WYHM0151a; WYHM0158; WYNC0017; WYNC0045; WYNC0046; WYNC0118.

*See* SUWA Map_Routes to Close in Alternative B. In addition to closing the above-mentioned routes, BLM should designate the following routes or portions of routes as OHV-Open in the selected Alternative to provide access to non-motorized recreation: GABD0110; WYBD0116; WYBD0119; WYBD0258a; WYBD0347.

While this modified Alternative B still favors motorized recreation, it would reduce some of the excess number and mileage of OHV routes in the TMA. Modified Alternative B would also establish some semblance of balance between resource protection, opportunities for non-motorized recreation, and opportunities for motorized recreation.

### i.  Alternative B Minimizes Damage to Soils and Vegetation

The Henry Mountains TMA contains a variety of soil types and native vegetation, all of which are susceptible to damage from OHV travel. Biological soil crusts—vital soil stabilizers that play a critical role in maintaining soil and ecosystem health—are found throughout the TMA. EA at 51. OHVs have a significant impact on biological soil crusts, such that even a single pass of an OHV will increase wind and water erosion of surface soils. *See* Diane W. Davidson *et al.*, *Selecting Wilderness Areas to Conserve Utah's Biological Diversity*, The Great Basin Naturalist, Vol. 56(2), 95-118, at 111 (1996) (attached). Repeated disturbance of soil crusts can permanently destroy soil crusts. Once disturbed, soils are more susceptible to wind erosion. *See* J. Belnap et al., *Wind Erodibility of Soils at Fort Irwin, California (Mojave Desert), USA, before and after trampling disturbance: implications for land management*, 32 Earth Surface Processes and Landforms, 75-84 (2007). Much of the soils within the TMA are also highly erosive. EA at 51-52. Dust production resulting from wind erosion represents "a significant threat to western US drylands, and the urgency to address this threat will likely only increase in a hotter, drier future." Michael C. Duniway *et al.*, *Wind erosion and dust from US drylands: a review of causes, consequences, and solutions in a changing world*, Ecosphere 19 (March 2019) (attached).[6] In addition to wind erosion, OHV use can "increase[] potential erosion and sediment transport into water bodies and riparian areas" and "can accelerate water erosion by decreasing infiltration rates, loosening surfaces and channeling runoff." EA at 52.

Native vegetation is also susceptible to damage from OHV travel. OHV use crushes and removes native vegetation and compacts soil. EA at 31. OHV use also introduces and spreads non-native vegetation, which competes with native vegetation. *Id.*

Because of the substantial damage OHV use causes to soil and vegetation, it is necessary to reduce the number and miles of designated routes throughout the TMA and especially in areas that are particularly vulnerable to soil and vegetation damage. Only Alternative B would do this. Alternative B would minimize impacts to soils and vegetation by reducing the routes designated for motorized use by about 500 miles. There are fewer miles of routes within each of the analyzed vegetation types in Alternative B, as opposed to alternatives A, C and D such that Alternative B "would have the lowest overall potential for OHV-related effects on native vegetation." EA at 33.[7] Similarly, with regard to soils, Alternative B would substantially reduce the number of routes crossing areas with high or moderate erosion potential. *Id.* at 53. Importantly, Alternative B would also substantially decrease the number of routes crossing areas

---

[6] *See also* Travis W. Nauman et al., *Elevated aeolian sediment transport on the Colorado Plateau, USA: The role of grazing, vehicle disturbance, and increasing aridity*, Earth Surface Processes and Landforms 1 (2018) (attached).

[7] The EA generally uses the *miles* of routes impacting a certain resource as a proxy for evaluating the relative impact of the alternative route networks, but for soils the EA instead relies on the *number* of routes or route segments crossing through different vegetation types. *See* EA at 29-30. While there are a number of problems with BLM's analysis using miles of designated route as a surrogate for analysis, *see supra*, using simply the number of routes is even more problematic. First, the EA confusingly states that the estimated effects are based on the number of route *segments* within the dominant vegetation type, but then goes no to simply refer to the number of routes evaluated within a vegetation type. *Compare id* at 30 *with id.* at Tbl. 11. Accordingly, it's unclear whether the EA is comparing number of routes or number of route segments. Second, if using the former, the EA is treating one short route that travels through a certain vegetation type the same as another single route that travels for miles through that same vegetation type.

with high and moderate cryptobiotic soil potential. *Id.* at 53-54. Accordingly, Alternative B "would have lower potential than other alternatives for adverse effects from OHV use on soil stability and erosion potential." *Id.* at 54.

### ii. Alternative B Minimizes Damage to Riparian Resources

The Henry Mountains TMA encompasses critically important water resources, including the Fremont River, Dirty Devil River, Muddy Creek, perennial streams, intermittent/ephemeral streams, wetlands, ground water and around 300 springs. EA at 55. While streams, riparian areas and wetlands account for only a small percentage of the land base in dryland areas like Utah, they have a disproportionate importance as the most productive lands. *See* Adam Switlaski, *supra*, at 89.

OHVs can have significant impacts on water resources, including by accelerating erosion and sedimentation and elevating levels of turbidity. *See* Douglas S. Ouren *et al.*, *Environmental Effects of Off-Highway Vehicles on Bureau of Land Management Lands: A Literature Synthesis, Annotated Bibliographies, Extensive Bibliographies, and Internet Resources*, USGS Open-File Report 2007-1353 25 (2007) (attached). "Wheel cuts and tracks within [OHV travel] networks may serve as water conduits that channel and direct water flow containing sediments and contaminants into aquatic ecosystems." *Id.*; *see also* EA at 56 ("Route use and maintenance disturbs soils making them more likely to erode into surface waters affecting water quality."). OHV use can also impact water quality through spills and emissions. Ouren *et al.*, *supra*, at 25. "Spill or emission contaminants may include 1,3 butadiene, benzene and ethylbenzene, xylenes, and toluene." *Id.*; EA at 56.

Despite the significant damage that OHVs can cause, and in many cases are causing to precious riparian resources in the TMA, only Alternative B would help minimize damage to riparian areas. For instance, Alternative B would designate fewer routes in proximity to streams and fewer routes in and near riparian areas. EA at 58-59. Alternative B would also reduce by 54% routes that have a high density of stream crossings and reduce by 51% routes in watersheds with high erosion potential. EA at 57-59. Alternative C, on the other hand, would still allow significant impacts to riparian areas, reducing only slightly the number of routes with a high density of stream crossings, routes in watersheds with high erosion potential and routes proximate to streams. *Id.* at 60. Alternative C would *increase* the number of routes in and near riparian areas. *Id.* Alternative D would be even more damaging, substantially increasing routes in riparian areas and increasing routes in watersheds with high erosion potential. *Id.* Alternative B is the only option that would minimize impacts to riparian resources.

### iii. Alternative B Minimizes Impairment of Wilderness Study Areas and Wilderness Characteristics

There are three classifications of BLM identified wilderness-quality lands within the TMP: Wilderness Study Areas (WSA), BLM Natural Areas and BLM-identified Lands with Wilderness Character (LWC). There are 11 WSAs; 12 BLM Natural Areas totaling around 78,600 acres; and about 614,000 acres of BLM-identified LWC.

Only Alternative B would minimize damage to WSAs, BLM Natural Areas and LWC. WSAs, Natural Areas and LWC are lands in a natural condition that provide outstanding opportunities for solitude and/or primitive recreation. Preserving large, intact wilderness-eligible landscapes is more important than ever. These lands offer a respite from the sight and sound of modern society, a refuge for imperiled species and other native wildlife, protection of cultural landscapes and artifacts, and opportunities for families to engage in non-motorized activities. Further, reducing dust-producing land uses like OHV use and protecting large, intact areas is "the most assured strategy for conserving soil resources, air quality, and limiting the deleterious effects of wind erosion and atmospheric dust to ecosystems, [and] humans." Duniway et al., *supra* at 19. Preserving intact landscapes also furthers the Biden Administration's commitment to conserve 30% of the country's terrestrial and marine environments by 2030. EO 14,008, *Tackling the Climate Crisis at Home and Abroad*, 86 Fed. Reg. 7619 (Feb. 1, 2021).

Alternative B is the only alternative that would reduce impacts to WSAs. BLM must manage WSAs "in a manner so as not to impair the suitability of such areas for preservation as wilderness." 43 U.S.C. § 1782. BLM "will protect the wilderness characteristics of all WSAs in the same or better condition that they were on October 21, 1976." Bureau of Land Mgmt., Manual 6330—Management of Wilderness Study Areas § 1.6.B (2012) (Manual 6330). Under Alternative B, BLM would designate 13 miles of routes for OHV use within WSAs, a meaningful reduction from the 49 miles currently designated. EA at 90-91. Alternatives C and D on the other hand would designate 44 miles and 55 miles of OHV routes in WSAs, respectively. *Id.* Both Alternatives C and D would designate *new* routes in WSAs—routes that were not designated in the 2008 RMP and routes that likely are not inventoried ways, in violation of BLM Manual 6330. *See* SUWA Map_New Routes in WSAs; *see also infra* Section IV (Wilderness Study Areas). Rather than minimize damage to WSAs, Alternatives C and D would increase damage to wilderness suitability and violate the non-impairment standard.

Alternative B is the only alternative that would minimize damage to BLM Natural Areas within the RMP. BLM committed in the Richfield RMP to manage Natural Areas to "[p]rotect, preserve, and maintain the[ir] wilderness characteristics (appearance of naturalness and outstanding opportunities for solitude or primitive and unconfined recreation)" as well as to [m]anage primitive and backcountry landscapes to preserve their undeveloped character and scenic quality, and to provide opportunities for primitive and unconfined activities and experiences of solitude." Richfield RMP at 102. Only Alternative B meets these requirements. Alternative B would reduce the miles of routes available for OHV use in BLM Natural Areas from 14 miles to 1 mile. EA at 95. Both Alternatives C and D would designate more routes than B and would damage the appearance of naturalness, opportunities for solitude and opportunities for primitive and unconfined recreation.

Alternative B is also the only alternative that would minimize damage to BLM-identified LWC. Under Alternative B, BLM would designate 76 miles of OHV routes in BLM-identified LWC, a meaningful reduction from the 380 miles currently designated. EA at 94. Alternatives C and D, on the other hand would not substantially reduce the miles of routes available for motorized use in LWC. Under Alternative C, BLM would designated 275 miles for OHV use. *Id.* Under alternative D, BLM would *increase* the mileage of routes for OHV use to 360 miles. *Id.* Both alternatives C and D would designate new routes for motorized use beyond those which are

currently designated. Rather than minimize damage to LWC, Alternatives C and D would increase damage to wilderness suitability.

Alternative B is the only option that would preserve the large, intact landscapes, advance the Biden Administration's climate goals and minimize impacts to wilderness suitability.

### iv. Alternative B Minimizes Damage to Cultural Resources

The Henry Mountains TMA contains an incredible array of cultural resources. Cultural sites in the planning area reflect more than 10,000 years of human history. EA at 26; *see also A Class I Cultural Resource Inventory of Lands Administered by the Bureau of Land Management, Richfield Field Office* 5-1 (June 2016) (Prepared by SWCA Environmental Consultants). Sites include artifacts, structures, rock shelters, petroglyphs, tools, thermal features from a number of distinct cultures, as well as historic mining sites and other evidence of anglo-settlers. *See, e.g.*, Bureau of Land Mgmt., *Finding of Adverse Effect for the Henry Mountains and Fremont Gorge Travel Management Plan* Tbl. 5 (Sept. 2024) (BLM Finding of Effect). BLM's cultural resource inventories identified more than 2,000 cultural sites within the Area of Potential Effect of the TMA. EA at 27.

While the TMA has abundant and significant cultural resources, OHVs are actively damaging cultural sites in the TMA. *See* BLM Finding of Effect Tbl. 5. OHVs cause soil erosion that exposes and erodes artifact deposits or subsurface features. EA at 28. Easy public access to sites via motorized routes is correlated with vandalism and site looting. *Id.* Dust from OHVs also damages cultural sites. *Id.* Under the current travel plan (Alternative A), at least 418 NRHP-eligible sites and 2 NRHP listed sites are intersected by motorized routes. "Designating route OHV-Closed may eliminate the potential for public OHV use to cause effects" such that "designating routes OHV-Closed through this action may be an effective method to avoid effects to cultural resources." *Id.* at 28. Alternative B would meaningfully reduce the number of cultural sites intersected by motorized routes and would meaningfully reduce the number of cultural sites within 150 of routes open to motorized use. *Id.* at 27. Accordingly, Alternative B "would have less potential for adverse effects than other alternatives." *Id.* at 29.

### v. Alternative B Minimizes Harassment of Wildlife and Minimizes Disruption of Wildlife Habitat, including for Threatened and Endangered Species

The TMA contains habitat for a variety of species, including big game, migratory birds, threatened and endangered bird species and species on BLM's sensitive species list. The TMA encompasses 206,123 acres of designated critical habitat for the Mexican spotted owl as well as potential breeding habitat for both the Southwestern willow flycatcher and yellow-billed cuckoo. EA at 41-42, 47-48. The TMA includes habitat for big game, including bison, desert bighorn sheep, mule deer, pronghorn and black bear. *Id.* at 118-19. The TMA also includes habitat for BLM sensitive species, including American goshawk, Burrowing owl, Ferruginous hawk, Allen's big-eared bat and kit fox. *Id.* at 114-16.

OHVs impact both wildlife and wildlife habitat. Motorized travel creates stress from noise disturbance, direct mortality by vehicle crushing and collisions, altered behavioral or population distributions, and fragmented habitat. *See* Douglas S. Ouren *et al.*, *supra* at 16-22. Beyond the physical impact from OHV use and OHV routes, "[n]oise from OHVs can travel miles in open landscapes and can negatively impact wildlife in a variety of ways including disturbance, avoidance, disruption of breeding habitat, reduction of migration routes, reduction of quality of habitat and loss of habitat." *See* Adam Switalski, *supra* at 89 (2018). These impacts can all lead to declines in local populations, and for some rare species, declines that impact their entire populations. *See* Douglas S. *et al.*, *supra* at 16-22

Alternative B would minimize the harassment and minimize the disruption of wildlife habitat by reducing the number and mileage of routes in wildlife habitat, especially in Mexican spotted owl habitat, as well as in Southwestern willow flycatcher and Yellow-billed cuckoo habitat. EA at 45-47. Alternative B would also reduce the mileage of routes designated in big game habitat. *Id.* at 119.

### vi.  Alternative B Minimizes Conflicts between OHV Use and other Existing or Proposed Recreational Uses

The TMA provides opportunities for a variety of outdoor recreation opportunities, including hiking, backpacking, canyoneering, horseback riding, photography, rafting, mountain biking, cultural site view, and camping. EA at 66-76. Each of these non-motorized recreation opportunities is impacted by OHV use. OHV use generates significant sound impacts traveling well beyond the designated route itself as well as short- and long-term visual impacts (e.g. dust plumes).

Alternative B would designate more than 1,300 miles of routes for motorized vehicle use. As modified above, it provides access to non-motorized recreation opportunities. It provides access to scenic overlooks and cultural sites. It provides access to countless dispersed campsites. It also provides substantial opportunities for motorized recreation. While Alternative B provides access to and opportunities for both motorized and non-motorized recreation, it also minimizes damage to natural and cultural resources.

### vii.  Alternative B Minimizes Damage to National Parks and National Recreation Areas.

The TMA is adjacent to National Park Service (NPS)-managed lands, including Capitol Reef National Park, Canyonlands National Park and Glen Canyon National Recreation Area. Accordingly, there are many routes that potentially impact NPS-managed lands. *See, e.g.*, EA at 126-28. OHV use can facilitate unauthorized motorized use and attendant damage to Park Service resources, including auditory and visual impacts, as well impacts from human waste, litter, vandalism and hazardous fluid leaks. *See* EA at 128.

Alternative B would designate 44 miles of routes that provide access to Canyonlands, Capitol Reef and Glen Canyon. Alternative B allows crucial access to NPS-managed lands while also

closing routes that facilitate unauthorized motorized intrusions and motorized damage to Park Resources. *Id.*

In sum, BLM should select a modified Alternative B in its final travel plan. Alternative B will minimize damage to soils, native vegetation, wilderness-quality lands, cultural resources, wildlife and wildlife habitat. It will also minimize conflicts between resource users.

## IV.    Wilderness Study Areas

BLM must manage WSAs "in a manner so as not to impair the suitability of such areas for preservation as wilderness." 43 U.S.C. § 1782. BLM "will protect the wilderness characteristics of all WSAs in the same or better condition that they were on October 21, 1976." BLM Manual 6330 § 1.6.B. In managing to prevent the impairment of wilderness characteristics, BLM will "prevent impairing activities" and continually monitor to "ensure continued suitability for designation as wilderness." *Id.* § 1.6.B.1.

All uses within a WSA, including motorized vehicle use, must meet the non-impairment standard. BLM Manual 6330 § 1.6.D.6.b. Motorized vehicle use can only occur in WSAs "on primitive routes (or 'ways') identified by the BLM as existing on October 21, 1976" if the route was identified in the original wilderness inventory. *Id.* Even then, "[p]rimitive routes within WSAs may only be used to the extent that the physical impacts of the primitive route are not greater than existed on October 21, 1976." *Id.* "[T]he BLM must take action to ensure the route does not exceed the approximate conditions of impact to the wilderness characteristics that existed on October 21, 1976." *Id.* Furthermore, "[a]ny motorized/mechanized linear transportation feature located within [WSAs] will be identified in a transportation inventory as a motorized/mechanized 'primitive route' . . . *Primitive routes will not be made a part of the transportation system*." *Id.* (BLM Manual 1626 § 6.5.E) (emphasis added).

The Henry Mountains and Fremont Gorge TMA contains 11 WSAs: Little Rockies, Dirty Devil, Fiddler Butte, Fremont Gorge, French Spring/Happy Canyon, Horseshoe Canyon North, Horseshoe Canyon South, Mount Ellen/Blue Hills, Bull Mountain, Mount Hillers and Mount Pennell.[8] Nine of these WSAs have primitive routes that BLM erroneously designated in the Richfield RMP as open to motorized vehicles, for a total of about 44 miles of routes in WSAs.[9]

---

[8] BLM recently changed the boundaries for many of the WSAs within the TMP. While BLM purports to be simply correcting mapping errors, in fact the agency in some instances substantially altered WSA boundaries. The agency also improperly cherrystemmed some routes. *Compare* Richfield RMP at Map 29 *with* Bureau of Land Mgmt. *Henry Mts and Fremont Gorge Travel Management Plan Interactive Map*, https://experience.arcgis.com/experience/7f68fabe0023400581fbeb7fa173c46d (last visited Oct. 24, 2024) (Henry Mountains Interactive Map). All the WSAs within the TMA were established under FLPMA Section 603. Accordingly, BLM does not have the authority to make such alternations without an act of Congress. *See, e.g.*, BLM Manual 6330 § 1.6.B.4.a ("WSAs established under the authority of Section 603 of FLPMA are identified in the 1993 reports to Congress (as depicted on supporting maps), and can only be altered by Congress."). Further, "[i]mpacts resulting from unauthorized activities may not be cited to adjust the boundaries of a WSA." *Id.* Compounding this problem, BLM's GIS data on the Bureau of Land Management Geospatial Business Platform does not reflect the updated boundaries and does not reflect the WSA boundaries shown on BLM's interactive map. This makes it difficult to properly assess the full extent of BLM's changes.

[9] The EA claims that there are 49 miles of OHV routes in WSAs in Alternative A. This is inaccurate and does not accurately reflect the route designations in the Richfield RMP. *Compare* TMP EA at 91 (stating that there are 49

*See* Richfield RMP at 145. The Richfield RMP makes clear that motorized use within WSAs will continue only on a "conditional basis . . . as long as the use of these routes does not impair wilderness suitability." *Id.* at 143. Use of these primitive routes is also conditioned on "user compliance and non-impairment of wilderness values." *Id.*

Motorized use within the these WSAs violates FLPMA, BLM Manual 6330 and the Richfield RMP.

There are multiple problems with BLM's treatment and analysis of impacts to WSAs in the EA.

First, BLM underestimates and does not properly detail current and potential future impacts from OHV route designations in WSAs within the TMA. To the extent that motorized use has been *allowed* on primitive routes improperly designated in the Richfield RMP, that use is currently impairing wilderness characteristics, expanding the physical impact of the primitive routes beyond that which existed in 1976 and facilitating illegal OHV use in the WSAs. For instance, on route WYBD0351 in the Horseshoe Canyon South WSA, motorized use has increased the footprint of the route, damaging vegetation and soils as well as the appearance of naturalness within the WSA. Similarly, motorized use on GAHM0498 in the Mt. Pennell WSA is damaging wilderness characteristics as motorized users attempt to bypass washouts and drive well outside the footprint of the route, trampling vegetation and causing deep ruts to form. Motorized use on GAHM0498 is also damaging fragile riparian areas. *See* BLM Manual 6330 § 1.6.D.5.b.iv.B (noting that closing routes in WSAs is appropriate where "[d]eterioration of the route has occurred, causing drivers to bypass a section(s) of the route (for example, the surface of a primitive route has eroded causing drivers to bypass the original route and drive parallel to it))."

Motorized use on primitive routes in WSAs is also facilitating illegal off-route use. For example, OHV use on route GAHM0061 in the Mount Ellen/Blue Hills WSA is facilitating illegal off-route use to the extent that BLM identified two unauthorized routes in the evaluated route network: GAHM0062 and GAHM0064.

BLM acknowledges there has been some physical impact from OHV use in WSAs, but the EA substantially underestimates that damage. *See* EA at 90 (estimating that there has been 10 acres "affected by OHV route expansion and/or dispersed camping").[10] The EA also fails to sufficiently acknowledge or discuss impacts beyond physical damage that allowing a non-conforming use—motorized travel—within WSAs itself has on wilderness values. OHV use damages natural soundscapes, damages opportunities for solitude and also damages opportunities for primitive and unconfined recreation. *But see id.* at 90 (claiming that visitors can simply travel farther into WSAs to escape visual and auditory impacts from OHVs).

While underestimating the damage that OHV use causes to WSAs, the EA also overestimates damage to recreational access from closing ways in WSAs. *See, e.g.*, EA at 91. The EA claims that closing routes in WSAs would "diminish opportunities to experience wilderness characteristics." *Id.* This claim fails to account for the fact that there are many motorized access

---

miles of designated routes) *with* Richfield RMP at 145 ("A total of 44 miles of inventoried ways would be designated for use" in WSAs).

[10] BLM does not provide any information about where this damage has occurred.

points for each WSA, including boundary routes, cherry-stem routes and routes that lead to WSA boundaries.

Second, compounding BLM's incomplete analysis of impacts to WSAs from OHV use, BLM is attempting to add *new* routes in WSAs, beyond the 44 miles that were designated in the Richfield RMP. SUWA Map_New Routes in WSA (attached). There is no indication that these routes were identified by BLM as existing on October 21, 1976 in the original wilderness inventory. *See, e.g.*, BLM Route Report GAHM0023a (admitting that the route proposed to be open in Alternative D is not an inventoried way). BLM cannot allow motorized use on primitive routes that the agency did not identify as existing on October 21, 1976. Manual 6330 § § 1.6.D.6.b.i.B. Further, designating these new routes would lead to new damage to wilderness values and impair wilderness suitability.

Pursuant to Manual 6330 and the Richfield RMP, BLM should close all primitive routes in the WSAs to motorized vehicles.

## V.    Natural Areas

The Richfield RMP designated 12 Natural Areas, totaling around 78,600 acres. Richfield RMP at 102. BLM committed to "[p]rotect, preserve, and maintain the wilderness characteristics (appearance of naturalness and outstanding opportunities for solitude or primitive and unconfined recreation) within these [N]atural [A]reas." *Id.* BLM further committed to manage these "primitive and backcountry landscapes to preserve their undeveloped character and scenic quality and to provide opportunities for primitive and unconfined recreational activities and experiences of solitude." *Id.* Despite this commitment, BLM designated about 20 miles of motorized routes in these Natural Areas. *See* Richfield RMP Map 16.

BLM's analysis of potential impacts to designated Natural Areas in the EA is incomplete or inaccurate. As with WSAs, BLM appears to have substantially changed the boundaries of designated Natural Areas. Rather than mere corrections to GIS data, the agency is substantively changing the boundaries of the Natural Areas in an apparent attempt to exclude routes.[11] Natural Area designations and land-use designations and cannot be changed in an implementation-level travel plan.

## VI.    National Environmental Policy Act

### a.  Legal Background

NEPA has two fundamental purposes: (1) to guarantee that agencies take a "hard look" at the consequences of their actions before the actions occur by ensuring that agencies, "in reaching [their] decision[s], will have available, and will carefully consider detailed information concerning significant impacts," *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332,

---

[11] BLM's recently-uploaded Wilderness Character GIS layer does not accurately reflect the boundary changes that are reflected on BLM's interactive map. BLM must immediately correct the GIS data layers to reflect changes to Natural Area changes and provide that information to the public.

349-350 (1989); and (2) to ensure "the relevant information will be made available to play a role in both the decisionmaking process and the implementation of that decision," *id.* at 349.

NEPA achieves its purpose through action-forcing procedures that require agencies to take a hard look at the environmental consequences of their actions and authorizations "utilizing public comment and the best available scientific information." *Id.* at 350. NEPA requires that federal agencies carefully consider relevant "detailed information concerning significant environmental impacts" and share that information with the public. *See Blue Mountain Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998). General statements about "possible" effects and "some risk" do not constitute a hard look.

### b. BLM Has Failed to Take a Hard Look at the Direct, Indirect and Cumulative Impacts of the Proposed Route Networks

NEPA requires agencies take a "hard look" at the environmental consequences of a proposed action and the requisite environmental analysis "must be appropriate to the action in question." *Metcalf v. Daley*, 214 F.3d 1135, 1151 (9th Cir. 2000); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). "NEPA 'prescribes the necessary process' by which federal agencies must 'take a "hard look" at the environmental consequences' of the proposed courses of action." *Pennaco Energy, Inc. v. U.S. Dept. of the Interior*, 377 F.3d 1147, 1150 (10th Cir. 2004) (quoting *Utahns for Better Transp. v. U.S. Dept. of Transp.*, 305 F.3d 1152, 1162—63 (10th Cir. 2002)) (citation omitted). The fundamental objective of NEPA is to ensure that an "agency will not act on incomplete information only to regret its decision after it is too late to correct." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1990) (citation omitted)). In order to take the "hard look" required by NEPA, BLM must assess impacts and effects that include: "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, *whether direct, indirect, or cumulative.* Effects also include effects on cultural resources and climate change-related effects." 40 C.F.R. § 1508.1(i)(4) (emphasis added).

NEPA regulations define "direct effects" as those that "are caused by the action and occur at the same time and place." *Id.* § 1508.1(i)(1). The regulations define "indirect effects" as those that are:

> [C]aused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects *related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.*

*Id.* § 1508.1(i)(2) (emphasis added). "Cumulative impacts" are defined as:

> [E]ffects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such

actions. Cumulative effects can result from individually minor but collectively significant effects taking place over a period of time.

*Id.* § 1508.1(i)(3). Accordingly, NEPA requires that BLM engage in a searching and detailed analysis on the environmental effects of its actions, as well as ongoing and foreseeable uses of land, such as mineral development (e.g., uranium, helium, oil and gas), livestock grazing, OHV use and changes to land from other factors such as climate change.

### i. BLM Failed to Take a Hard Look at Cumulative Impacts.

The EA fails to take a hard look at the cumulative impacts of the proposed action when viewed with past, present, and reasonably foreseeable future actions. In the EA, BLM provides a general "Cumulative Impact Scenario" section that lays out a generic list of "influences on the regional landscape in southeastern Utah." EA at 23. The EA then lists certain projects BLM deems relevant to the cumulative impacts in the analysis area and project acres of land that would be impacted by those projects. *Id.* at 23-24. Then, for each resources, BLM outlines that Cumulative Impact Analysis Area (CIAA) and for most resources provides a sentence or two of what it labels as "analysis," but which merely highlights the unsurprising fact that these actions, when viewed together, will have incremental impacts on the relevant resource value. *See, e.g.*, EA at 33-34 (noting that increased route designations in Alternative D "could result in a correspondingly slight increase in overall cumulative effects on native vegetation"); EA at 39-40 (acknowledging that Alternatives C and D "would result in slight increases or decreases in accumulating effects on the TMA's special status plants proportionate with their increases or decreases in OHV-Open and OHV-Limited routes"); EA at 89 (recognizing that "Alternative D would result in increases of route miles available for OHV use in both VRI and VRM I and II areas."). This approach violates NEPA.

To take a "hard look" at the cumulative impacts of its actions, BLM must (1) identify all relevant past, present, and reasonably foreseeable future actions, and (2) analyze the cumulative impacts of those actions on the affected environment. *See San Juan Citizens Alliance v. Stiles*, 654 F.3d 1038, 1056 (10th Cir. 2011) (setting out 10th Circuit's test for analyzing cumulative impacts); *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1104 (9th Cir. 2016).

### 1. BLM Improperly Limited its Identification of All Past, Present, and Reasonably Foreseeable Future Actions.

Identifying all past, present, and reasonably foreseeable future actions is a two-step process. First, BLM must define a CIAA for each affected resource. A CIAA is the "geographic scope for each cumulative effects issue, which . . . help[s] [BLM] bound the description of the affected environment." Bureau of Land Mgmt., *National Environmental Policy Act*, Handbook 1790-1 § 6.8.3.2, pg 58 (Jan. 2008) (BLM NEPA Handbook). A properly defined CIAA "is generally based on the natural boundaries of the resource affected, rather than jurisdictional boundaries." *Id.* A properly defined CIAA is necessary to "insure a fully informed and well-considered decision." *Colo. Envtl. Coal.*, 108 IBLA 10, 18 (1989) (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Res. Defense Council*, 435 U.S. 519, 558 (1978)). *See also Citizens for a Healthy Comm. v. Bureau of Land Mgmt.*, 377 F. Supp. 3d 1223, 1246 (D. Colo. 2019) (setting-aside BLM's decision because it was based on improperly defined and inconsistent CIAAs).

Second, after defining the CIAAs, BLM must "identify the relevant 'past, present, and reasonably foreseeable future actions,' that might affect the environment in the area of the [proposed action]." *Great Basin Res. Watch*, 844 F. 3d at 1104. Reasonably foreseeable actions include those that "have been publicly announced and at least some of their specifics known." *S. Utah Wilderness All.*, IBLA No. 2019-94, at *6-7 (Sept. 16, 2019) (citations omitted; decision attached).

The identification of other projects—past, present, and reasonably foreseeable—forms the baseline data on which BLM's cumulative impacts analysis is built. Accurate baseline data is essential to satisfy BLM's informed decision-making mandate because without such information "there is simply no way to determine what effect the project will have on the environment and, consequently, no way of complying with NEPA." *Or. Natural Desert Ass'n*, 921 F.3d at 1190 (quoting *Great Basin Res. Watch*, 844 F.3d at 1101).

There are two primary problems with the EA's identification of all past, present and reasonably foreseeable future actions. First, the CIAA for recreation is arbitrarily limited, thereby improperly skewing the cumulative effects analysis. And second, the list of projects and associated acres of impact for resources is incomplete and underestimates the acres of potential impact.

In the general "Cumulative Impact Scenario" Section, the EA highlights other completed travel plan and one ongoing travel plan in the San Rafael Swell. EA at 23-24. In the Recreation Section, the EA then defines the CIAA as BLM-managed routes affected by *this* plan as well as the Labyrinth/Gemini Bridges TMP, Canyon Rims (Indian Creek) TMP, the San Rafael Swell TMA, and the San Rafael Desert TMP. *Id.* at 61. BLM explains that "the recent TMP route designation decisions in these areas, combined with the Henry Mountains/Fremont Gorge TMP, will serve to portray a potential comprehensive region-wide travel network of motorized opportunities and experiences." *Id.*

This CIAA arbitrarily limits the cumulative effects analysis and overinflates the impact of proposed route closures in the Henry Mountains TMP. There are roughly 5,000 miles of designated routes on BLM-managed lands in the Price, Richfield and Moab field offices <u>outside of</u> the ongoing or completed TMPs. *See* SUWA Map_Cumulative Impact Analysis Area_Travel Planning OHV Recreation (attached). There are also more than 3,500 miles of Forest Service system routes within the general area of the TMP. *See id.* Like the routes in the completed TMP, these routes provide "a comprehensive region-wide travel network of motorized opportunities and experiences." EA at 23-24. These roughly 8,500 miles of routes are currently available for OHV use and associated dispersed camping and should properly have been included in the cumulative impact analysis. By failing to include these routes, BLM has painted an incomplete picture with regard to routes available for motorized use, skewed the cumulative impacts analysis, and acted arbitrarily. BLM must revise the CIAA for Recreation.

In addition to the improper CIAA for Recreation, BLM fails to adequately estimate potential areas of impact from the listed past, present and reasonably foreseeable actions. For instance, the EA notes that "there are a variety of known past, present, and foreseeable plans and structures

related to wildlife habitat management, including private, state, and federal restoration . . . wildlife water guzzlers, riparian protection projects, and vegetation treatments." EA at 24. However, rather than attempt to provide information regarding, for example, acres of impact from existing structures related to wildlife habitat management or wildlife water guzzlers, the EA simply lists acreage of recent forest thinning and planned pinyon-juniper treatment. *Id.*

Similarly, the EA acknowledges that the TMA contains "numerous rangeland improvements" related to livestock grazing, but does not attempt to quantify the acreage of impact from those improvements and instead simply notes that grazing allotments in general make up 1,829,706 acres of the region. *Id.* BLM's predicted acreage of impact should include known existing grazing improvements, structures related to wildlife habitat management, etc. BLM's failure to account for these existing and reasonably foreseeable impacts underestimates potential cumulative effects and is arbitrary.

## 2. BLM failed to Analyze the Cumulative Impacts of Past, Present and Reasonably Foreseeable Future Actions

In addition to <u>identifying</u> past, present, and reasonably foreseeable future actions, BLM must <u>analyze</u> the cumulative impacts of those actions in combination. "[S]imply listing all relevant actions is not sufficient." *Great Basin Res. Watch*, 844 F.3d at 1104. BLM must also provide some quantified or detailed information. *Id.* "Without such information, neither the courts nor the public . . . can be assured that the [agency] provided the hard look that it is required to provide." *Id.* (internal citations omitted) (citing *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379 (9th Cir. 1998)). *See also Diné CARE*, 923 F.3d at 853-54, 856-59 (setting-aside permits to drill for BLM's failure to identify and analyze cumulative impacts); *San Juan Citizens All. v. U.S. Bureau of Land Mgmt.*, 326 F. Supp. 3d 1227, 1247-48, 1252-54 (D.N.M. 2018) (BLM failed to analyze cumulative impacts of oil and gas leasing decisions).

NEPA demands a full accounting of cumulative impacts for the simple reason that "the total impact from a set of actions may be greater than the sum of the parts." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 994 (9th Cir. 2004). To illustrate this principle:

> [T]he addition of a small amount of sediment to a creek may have only a limited impact on salmon survival, or perhaps no impact at all. But the addition of a small amount here, a small amount there, and still more at another point could add up to something with a much greater impact, until there comes a point where even a marginal increase will mean that *no* salmon survive.

*Id.*

The same principle is true here. While it may be true that the designation of a few routes in cryptobiotic soils, wildlife habitat, riparian areas or in any other resource value, may have limited impact when viewed in isolation, "the addition of a small amount here, a small amount there, and still more at another point"—such as through new access roads for energy projects or

for grazing improvements—the combined effect of these projects "could add up to something with a much greater impact."

But BLM failed to provide any meaningful analysis of cumulative effects to most resources. Instead of providing quantified or detailed information regarding cumulative effects to different resources, BLM simply states that general conclusion that there will be cumulative effects to the analyzed resource.

For example, with regard to water resources, the EA states that "effects to riparian resources would either remain the same or decrease in intensity." EA at 60. Similarly, with regard to special status plants, the EA notes that "Alternatives C and D would result in slight increases or decreases in accumulative effects on the TMA's special status plants proportionate with their increases or decreases in OHV-Open and OHV-Limited routes." *Id.* at 40. BLM's cumulative impacts analysis regarding wilderness character provides slightly more information but still no meaningful analysis. The EA spends time arguing that designating routes will not actually impact wilderness character because the routes were inventoried and the areas still found to possess wilderness character. *Id.* at 97.

The EA does not explain how route designations, *in combination with* past, present and reasonably foreseeable future actions like vegetation treatments or grazing improvements may cumulatively affect wilderness character. *Id.* at 96-97. Without more detailed information, BLM cannot meaningfully understand the cumulative effects of the alternative route networks.

### ii. BLM Failed to Take a Hard Look at Impacts to Water Resources

The EA fails to take a hard look at impacts to water resources. The EA generally outlines the broad impacts that OHVs can have on water resources and notes that the alternative route networks will have varying routes with a high density of stream crossings, routes in watersheds with high erosion potential, routes in watersheds with a high density of routes, routes in close proximity to streams, and number of routes in and near riparian areas. EA at 55-60. However, the EA leaves out important information both to take the required "hard look" at water resources and to provide sufficient information to allow the public to understand the difference between the impact of the alternative route networks.

For instance, the EA does not define or explain how it identifies routes with a high density of stream crossings. *Id.* at 57. Similarly, the EA does not identify watersheds with high erosion potential nor does it discuss how many watersheds with high erosion potential are in the TMA. *Id.* at 60. The EA also does not explain how BLM decides at what distance a route is "in proximity" to a stream, or what BLM is considering a stream (perennial streams only, or does BLM properly include ephemeral/intermittent streams) in this analysis. EA at 45-60. Without this basic information, the public cannot understand the different impacts of each alternative on water resources.

The EA also notes that "BLM monitors wetland and riparian areas using Assessment, Inventory, and Monitoring Strategy and Proper Functioning Condition tools." EA at 56. Critically, however, BLM does not discuss the results on that monitoring. *Id.* The EA does not mention whether BLM

has recently assessed wetlands and riparian areas within the TMA or what the status of those assessments were. *Id.* Without that information, the public (and perhaps not even BLM) cannot understand the impacts of the alternative route networks on water resources. *Compare* Bureau of Land Mgmt., *Labyrinth/Gemini Bridges Travel Management Plan Environmental Assessment*, DOI-BLM-UT-Y010-2020-0097-EA 57-58 (Sept. 2023) (Labyrinth/Gemini TMP EA) (discussing the results of a PFC assessment in Ten Mile Wash, for example, which found that it was "Functioning at Risk" and how route designations could impact the condition of riparian areas within the TMA) *with* TMP EA at 56-60 (providing no meaningful information about the current status of wetlands and riparian areas within the TMA or any discussion of how the alternative route networks would affect the status of wetlands and riparian areas). BLM must correct this deficiency.

Similarly, the EA acknowledges that there are nine water assessment units within the TMA that are not meeting water quality standards and thus are considered impaired waterbodies by the Utah Division of Water Quality, including the Fremont River, Muddy Creek and Dirty Devil River. EA at 56. However, the EA does not provide any real analysis about the relative impact of each route and each route network on water quality. *Id.* at 56-60.

BLM's cursory "analysis" of impacts to water quality is unhelpful, does not provide sufficient information to BLM or to the public to understand the different impacts that each alternative will have on water resources within the TMA, and therefore fails NEPA's hard look test.

### iii. BLM Failed to Take a Hard Look at Impacts to Big Game, Upland Game, Migratory Birds and BLM Sensitive Species.

BLM declined to analyze impacts to big game and upland game, including bison, desert bighorn sheep, mule deer, pronghorn, wild turkey. *See* EA at 117-19. The agency also declined to analyze impacts to migratory birds and BLM sensitive wildlife species and their associated habitats. *See id.* at 113-17. BLM provides varying explanations for its failure to provide this basic analysis, including claiming that routes in the TMA have been used for 80-100 years so species have adapted to traffic, asserting that the 2008 RMP restricted cross-country OHV use in much of the TMA or claiming that evaluated routes have been subject to ongoing use. *Id.* at 113-19. This argument fails under NEPA.

BLM's explanation for its failure to take a hard look at impacts to big game, migratory birds, BLM sensitive species and the associated habitat for these wildlife species is problematic for several reasons. *First*, as discussed *supra* in Section II, many of the evaluated routes are reclaiming, do not exist on the ground or do not receive motorized use. In fact, under Alternatives C and D, BLM would be authorizing new surface disturbance that could impact big game, migratory birds and BLM sensitive species and their habitats.

*Second*, that much of the TMP was open to cross-country OHV travel prior to 2008 is irrelevant. Cross-country OHV use has not been allowed in this area for more than 15 years. Rather than relying on outdated information, BLM must both take a hard look at impacts to species from the alternative route networks currently under consideration and determine potential impacts to species. BLM's claim that some routes have been used for 80-100 years is similarly irrelevant.

There is no proof, nor has BLM provided any, that every route within the TMA has been subject to ongoing use such that BLM's new travel plan would have no impact to wildlife or species.

*Finally*, it is not only the physical existence of routes that impacts species and their habitat, but also the motorized *use* of those routes. Indeed, noise from OHVs can travel long distances and impact wildlife, including through "disturbance, avoidance, disruption of breeding habitat, reduction of migration routes, reduction of quality habitat, and loss of habitat." *See* Switalski, *supra* at 89; *see also* D.J. Schubert & Jacob Smith, *The Impacts off Off-Road Vehicle Noise on Wildlife*, The Road RIPorter 5.1 (attached) (collecting studies discussing the impact that OHV noise has on wildlife). And motorized use of routes can cause big game like mule deer or bison to avoid areas where such use is taking place. *See* Switalski, *supra* at 89 (explaining that mule deer avoided motorized access roads *during oil and gas development*, in other words, when routes are being used); Utah Division of Wildlife Res., *Bison Unit Management Plan Henry Mountains Unit #15* 21-22 (Aug. 2022) (attached) (discussing how bison are impacted by human activities, including fleeing areas after coming into contact with humans and ATV use pushing herds away from habitat).[12] OHV use can also lead to declines in breeding success and survival in song birds. *Id.* Closing routes in wildlife habitat—regardless of whether those routes exist on the ground or at some point have received OHV use—could meaningfully improve outcomes for a number of species. And BLM must analyze the varying impacts of the alternative route networks on big game, upland game, migratory birds and BLM sensitive species. *See also* Labyrinth/Gemini TMP EA at 68-87 (analyzing impacts to big game, migratory birds and BLM sensitive species despite that the Moab field office only analyzed alternative route networks that contemplated route designations for routes where use was *already authorized*). BLM's failure to undertake this analysis violates NEPA's hard look mandate.

### iv. BLM Failed to Take a Hard Look at Impacts to Lands with Wilderness Character.

The EA fails to take a hard look at impacts to BLM-identified LWC. The EA generally outlines the standards for an area to be considered LWC and then outlines broad impacts that OHV use can have on LWC and concludes generally that Alternative C would maintain current impacts to LWC and that Alternative D may lead to more impacts to LWC within the TMA. EA at 92-97. The EA lacks important information to understand potential impacts to LWC from the alternative route networks.

There are two primary problems with BLM's LWC analysis. First, the agency fails to provide basic information regarding the existence and extent of LWC within the TMA. Second, the agency fails to provide any meaningful analysis regarding the potential impacts to LWC from the alternative travel networks.

The Richfield RMP identified about 416,000 acres of LWC within the TMA. Since 2008, BLM has dropped some LWC units. *See, e.g.*, Bureau of Land Mgmt., Eplanning: Travel Management

---

[12] The Utah DWR's Bison Herd Management Plan also notes that use of water springs by campers or users can be particularly problematic. To properly analyze potential impacts from alternative travel networks to bison, BLM must discuss and analyze OHV routes that lead to or provide camping near springs. *See* Utah Div. of Wildlife Res., *supra*, at 22.

Plan for the Henry Mountains Fremont Gorge Travel Management Area, Updated LWC Inventory, https://eplanning.blm.gov/eplanning-ui/project/94098/570. The EA does not provide any information regarding the *current* acreage of BLM-identified LWC in the field office. *See* EA at 92-96. Compounding this problem, BLM's interactive map, which purports to show the current inventory of BLM-identified LWC, is not consistent with the updated GIS data BLM recently uploaded to its GIS hub. *Compare* Henry Mountains Interactive Map *with* Bureau of Land Mgmt,, Geospatial Business Platform, BLM UT Lands with Wilderness Characteristics, https://gbp-blm-egis.hub.arcgis.com/maps/78a226dd1ca04d14b8555e3195e831d7/about (last visited Oct. 2024) (showing several LWC areas dropped that are not similarly dropped in the interactive map). Without this data, it is difficult to understand how either the agency or the public could properly evaluate the potential impacts of the travel networks to LWC.

In addition to the lack of information regarding the current acreage of BLM-identified LWC, BLM does not provide any meaningful analysis regarding potential impacts to LWC. *See* EA at 95-96. For instance, the agency does not provide any information regarding whether selecting Alternative C or Alternative D (both of which designate new routes in BLM-identified LWC) may impact LWC units such that units may no longer meet the 5,000 acres side requirement. *Id.* at 95-97. Nor does the agency meaningfully discuss whether the route designations and OHV use of those routes, including increased OHV use, in the alternative route networks may affect LWC units to the extent that such use would affect naturalness. *See id.* Nor does the EA meaningfully discuss the comparative travel route networks' potential impacts to solitude. *Id.* Instead, the EA states the general conclusion that designating more routes in LWC could lead to more impacts to LWC. *Id.* at 96. This does not constitute a hard look.

### v. BLM Failed to Take a Hard Look at Impacts from Dispersed Camping.

The Richfield RMP allows vehicle parking and dispersed camping within 150 feet of designated routes. Richfield RMP at 126. The EA acknowledges that BLM allows such use. EA at 22. The EA further notes that BLM documented existing dispersed campsites in the route evaluations. *Id.* However, BLM does not use the information the agency says it gathered to analyze the impacts from such use, including the comparative acreage of impacts from dispersed camping with each alternative route network. *Id.* Instead, BLM simply states that impacts from off-route parking, staging and dispersed camping would be substantially similar to those associated with use along the route and declines to provide meaningful analysis. *Id.* This does not constitute a hard look under NEPA.

### VII.    Henry Mountains Geoheritage Site

The Henry Mountains were recently designated an International Geoheritage Site by the International Commission on Geoheritage [IUGS]. *See* Int'l Comm'n on Geoheritage, *Oligocene Laccoliths and Sedimentary Rock Domes of the Henry Mountains*, https://iugs-geoheritage.org/geoheritage_sites/oligocene-laccoliths-and-sedimentary-rock-domes-of-the-henry-mountains/ (2024); Brian Maffly, *How features in Utah and Arizona advanced geoscience*, Univ. of Utah Science & Technology, https://attheu.utah.edu/facultystaff/how-features-in-utah-and-arizona-advanced-geoscience/ (Aug. 2024). The Henry Mountains,

including Mount Holmes, Mount Ellsworth and Mount Hillers, are among the most important locations on earth for demonstrating geologic structures and processes. According to the IUGS, "[t]he dome-like structures in Triassic to Jurassic sedimentary rocks of the Henry Mountains offer the defining locality and one of the best exposures of laccoliths worldwide." Int'l Comm'n on Geoheritage, *supra*.

BLM must analyze the potential impact of route designations on the Henry Mountains geoheritage site and minimize damage to the site to protect this world-renowned resource. *See also* Marie Jackson, *Processes of Laccolithic Emplacement in the Southern Henry Mountains, Southeaster Utah* (1997) (attached); Marie D. Jackson & David D. Pollard, *Flexure and faulting of sedimentary host rocks during grown of igneous domes, Henry Mountains, Utah*, 12 J. of Structural Geology 185 (1990) (attached).

## VIII.  Cultural Resources

BLM has dual obligations when considering the impacts of its undertakings on cultural resources. Pursuant to Section 106 of the NHPA, BLM must "make a reasonable and good faith effort" to identify cultural resources that may be affected by an undertaking. 36 C.F.R. § 800.4(b)(1). Pursuant to NEPA, BLM must take a "hard look" at the effects of the proposed action. *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 781 (10th Cir. 2006). BLM must comply with both statutes when it undertakes travel planning.

### a.  National Historic Preservation Act

Congress enacted the NHPA in 1966 to implement a broad national policy encouraging the preservation and protection of America's historic and cultural resources. *See* 54 U.S.C. § 300101. The heart of the NHPA is Section 106, which prohibits federal agencies from approving any federal "undertaking" unless the agency takes into account the effects of the undertaking on historic properties that are included in or eligible for inclusion in the National Register of Historic Places. 54 U.S.C. §§ 306108, 300320; *see also Pueblo of Sandia v. United States*, 50 F.3d 856, 859 (10th Cir. 1995). Section 106 is a "stop, look, and listen provision" that requires federal agencies to consider the effects of their actions and programs on historic properties and sacred sites before implementation. *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999).

To adequately "take into account" the impacts on archeological resources, all federal agencies must comply with binding Section 106 regulations established by the Advisory Council on Historic Preservation (Advisory Council). Under these regulations, the first step in the Section 106 process is for an agency to determine whether the "proposed [f]ederal action is an undertaking as defined in [Section] 800.16(y)." 36 C.F.R. § 800.3(a). Undertakings include any permit or approval authorizing use of federal lands. *Id.* § 800.16(y). If the proposed action is an undertaking, the agency must determine "whether it is a type of activity that has the potential to cause effects on historic properties." *Id.* § 800.3(a). An effect is defined broadly to include direct, indirect, and/or cumulative adverse effects that might alter the characteristics that make a cultural site eligible for listing in the National Register of Historic Places. *See id.* § 800.5(a)(1); *id.* § 800.16(i); 65 Fed. Reg. 77,698, 77,712 (Dec. 12, 2000).

The agency next "[d]etermine[s] and document[s] the area of potential effects" and then "[r]eview[s] existing information on historic properties within [that] area." 36 C.F.R. § 800.4(a)(1)-(2). "Based on the information gathered, . . . the agency . . . shall take the steps necessary to identify historic properties within the area of potential effects." *Id.* § 800.4(b). "The agency shall make a reasonable and good faith effort to carry out appropriate identification efforts." *Id.* § 800.4(b)(1).

If the undertaking is a type of activity with the potential to affect historic properties then the agency must determine whether in fact those properties "may be affected" by the particular undertaking at hand. *Id.* § 800.4(d)(2).[13] Having identified the historic properties that may be affected, the agency considers whether the effect will be adverse, using the broad criteria and examples set forth in section 800.5(a)(1). Adverse effects include the "[p]hysical destruction of or damage to all or part of the property," as well as "[i]ntroduction of visual, atmospheric or audible elements that diminish the integrity of the property's historic significant historic features." *Id.* § 800.5(a)(2)(i) & (2)(v). If the agency concludes that the undertaking's effects do not meet the "adverse effects" criteria—that is, the agency concludes that there *may* not be an adverse effect from the undertaking—it is to document that conclusion and propose a finding of "no adverse effects." *Id.* § 800.5(b), 800.5(d)(1).

If the agency official concludes that there *may be* an adverse effect, it engages the public and consults further with the state historic preservation officer, Native American tribes, consulting parties, and the Advisory Council in an effort to resolve the adverse effects. *Id.* §§ 800.5(d)(2), 800.6.[14]

SUWA is a consulting party on the Henry Mountains/Fremont Gorge TMP. SUWA provided separate comments regarding the Section 106 process, including highlighting BLM's failure to account for reasonably foreseeable effects to historic properties, improper combination of adverse effects determination and resolution of adverse effects, unsupported and arbitrary adverse effect determinations and failure to account for impacts to culturally significant areas. *See* Letter from Laura Peterson, Attorney, S. Utah Wilderness All., to Kandi Rutan, Archaeologist, BLM Richfield Field Office (Oct. 24, 2024) (attached).

### b. Hard Look

In addition to BLM's obligations under the NHPA, NEPA requires BLM to take a "hard look" at the environmental effects of a proposed action. *Silverton Snowmobile Club*, 433 F.3d at 781 (10th Cir. 2006). An EA must demonstrate "the agency's thoughtful and probing reflection of the possible impacts associated with the proposed project." *Id.* (quoting *Comm. To Preserve Boomer Lake Park v. Dep't of Transp.*, 4 F.3d 1543, 1553 (10th Cir. 1993)). Pursuant to NEPA, BLM must analyze all potential direct, indirect, and cumulative impacts to *cultural resources*, regardless of whether those cultural resources are eligible for listing in the National Register. *See*

---

[13] The agency may also determine that there are no historic properties present or there are historic properties present but the undertaking will have no effect upon them, at which point it consults with the State Historic Preservation Officer and notifies relevant Native American tribes of its conclusion. *Id.* § 800.4(d)(1).

[14] SUWA is a consulting party on the Dolores travel plan and recently submitted comments regarding the appropriate "area of potential effects" for this undertaking.

BLM Manual 8100 – The Foundations for Managing Cultural Resources (Public) .03.F (Dec. 3, 2004) ("Cultural resources need not be determined eligible for the National Register of Historic Places . . . to receive consideration under [NEPA]."). Though NHPA analysis is related to NEPA analysis, they are not one and the same.

Here, BLM failed to take a hard look at the direct, indirect and cumulative impacts to cultural resources, including ineligible sites and isolated finds. First, the EA provides no information regarding isolated finds and does not include any information regarding potential impacts to isolated occurrences from the alternative travel networks. *See* EA at 27. Second, the EA provides only a general and cursory assessment of potential impacts that OHVs can cause to cultural resources. *See id.* at 27-28. The EA states that OHVs can cause erosion and associated erosion of artifact deposits. *Id.* at 28. Indirect effects from OHV use include facilitating public access to sites which can lead to vandalism and looting. *Id.* These sorts of generalized statements are not helpful in determining the comparative impact of the proposed route networks to cultural sites.

BLM has failed to take a hard look at impacts to cultural sites.

## IX.    Route-Specific Comments

Attached to these overall comments are route-specific comments providing significant information on numerous routes within the Henry Mountains TMA. This information includes observed route attributes and narratives discussing BLM's compliance (or lack thereof) with the Minimization Criteria and the Settlement Agreement. Because of the size of this document, route-specific comments and route reports have been sent via USPS First Class Mail (along with other referenced attachments). These route-specific comments must all be considered part of the comment record for every route segment mentioned.

## Conclusion

BLM should select a modified Alternative B that closes not only the routes identified in Alternative B but the additional routes highlighted in these comments. Alternative B is the only option that is consistent with BLM's legal obligation to minimize damage to natural and cultural resources. BLM must also remedy the deficiencies identified in these comments. Thank you for your consideration of these comments.

Sincerely,

Laura Peterson
Southern Utah Wilderness Alliance
www.suwa.org



**Loa**

**Torrey**

**Hanksville**

72

24

95

276

Legend:
- Open or Limited Alt D in WSAs that are not open in 2008 RMP
- Inventoried Routes
- Wilderness Study Area
- TMA Boundary

0 3 6 9 12 Miles

N





**SOUTHERN UTAH WILDERNESS ALLIANCE**

425 East 100 South
Salt Lake City, UT 84111
801 486 3161
www.suwa.org

## Routes to Close in Alternative B

Draft EA Henry Mountain/Dirty Devil TMP
Map 1 of 2

— Alternative B Proposed Closures
— Alternative B
▫ TMA Boundary



HENRY MOUNTAINS TMA

C. Murdock(10/24/2024) | Data: BLM | Project #743



GAHM0492b

GAHM0316

GAHM0360

95

276

GAHM0416e

Ticaboo

GAHM0442c

0 0.75 1.5 2.25 3 Miles



SOUTHERN UTAH WILDERNESS ALLIANCE

425 East 100 South
Salt Lake City, UT 84111
801 486 3161
www.suwa.org

**Routes to Close in Alternative B**
Draft EA Henry Mountain/Dirty Devil TMP
Map 2 of 2



——— Alternative B Proposed Closures
——— Alternative B
▨ TMA Boundary

HENRY MOUNTAINS TMA





Henry Mountains/Fremont Gorge TMP Routes in OHV-Closed Areas: Alternative D

**Alt D Routes within OHV-Closed Areas**

— Closed routes in OHV-Closed Areas

— Open routes in OHV-Closed Areas

— Inventoried routes

OHV-Closed Areas (2008 Richfield RMP)

D. Callahan (10/25/2024) | Data: BLM | Project #652



Henry Mountains/Fremont Gorge: Cumulative Impact Analysis Area ID.547   Page 38 of 38

**Legend:**
- Designated Routes Outside TMAs
- Designated Routes w/in Completed TMPs
- Designated Routes in Ongoing TMPs
- BLM Field Offices
- TMA Boundaries
- National Forests

Nephi
Price
Price FO
Moab FO
Fillmore
Green River
Richfield
Moab
Beaver
Torrey
Hanksville
Richfield FO
Boulder
Escalante
Cedar City

0  7  14  21  28 Miles

D. Callahan [10/18/2024] | Data: BLM | Project #737